**BRIAN JACKSON ASSOCIATES, INC.,**
an Arizona corporation, Plaintiff,

v.

**KENNECOTT COPPER CORPORATION,**
a New York corporation, Defendant.

Civ. No. 119.

United States District Court
D. Arizona.

April 27, 1962.

Goddard & Barry, Harry Gin, Tucson, Ariz., George M. Sterling, Phoenix, Arizona, John J. McLaughlin, Scottsdale, Ariz., for plaintiff.

Willis H. Taylor, Jr., and Hal E. Seagraves, New York City, Fennemore, Craig, Allen & McClennen, Phoenix, Ariz., for defendant.

JAMES A. WALSH, Chief Judge.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

This action having been tried by the court without a jury, the court hereby finds the facts and states its conclusions of law as follows:

### FINDINGS OF FACT

1. The plaintiff, Brian Jackson Associates, Inc., is an Arizona corporation and the owner, by assignment, of all right, title and interest in and to Redmond Patent No. 2,895,821.

2. At the time of the trial the inventor and patentee, Eugene R. Redmond, was the owner of a subtantial stock interest in the plaintiff corporation, such interest having been received by him in payment of his assignment of his patent rights.

3. Defendant, Kennecott Copper Corporation, is a New York corporation licensed to do business in the State of Arizona, and operates a copper smelter at Hayden, Arizona, through its Ray Mines Division.

4. Plaintiff does not engage in the smelting of copper, has no other industrial activity, and was organized and exists solely as a patent holding and licensing activity, with particular reference to the patent in suit.

5. The complaint, as filed, joined as a party defendant San Manuel Copper Corporation, a Delaware corporation licensed to do business in Arizona. The case came on for hearing, however, pursuant to a second amended complaint and answer thereto, in which second amended complaint only Kennecott Copper Corporation is defendant.

6. The second amended complaint charges infringement within Arizona of the claims of Redmond Patent No. 2,895,821 owned by plaintiff. Defendant has denied infringement, and asserted that the Redmond patent is invalid.

7. Plaintiff by letter notified defendant of the existence of its said Patent No. 2,895,821, charged defendant with infringement, and offered to license defendant to employ the process of the patent on a royalty basis. Defendant did not acknowledge said notice.

8. Copper smelting is such an old art that its origin goes back to antiquity. While apparatus, sources of copper, and specific techniques have varied extensively, the art of smelting has always included melting the ore or concentrate; bring it into contact with air to produce a relatively impure copper mass which can be

separated from the stone-like material with which it is usually mixed; further contacting the copper mass with air to oxidize the mass and then removing impurities as slag or an escaping gas; poling the copper to remove at least part of the oxygen introduced by the air used as a reagent to oxidize impurities; and then casting the copper into bars, ingots or anodes. Poling traditionally has been accomplished with fresh cut wood poles, as the name implies, but in recent years specially constituted gases have been used for "poling" to remove oxygen.

9. Equipment of various kinds and of various sizes has been used in copper smelting, depending in part on the source of copper used, in part on the specific processing employed, and in part, also, on the size of the charge. In general, this equipment has been heated either by an external heat source, or by the exothermic reaction resulting from the oxidation of the material itself. One type of furnace used is the reverberatory type in which the charge lies in a shallow hearth, and is heated by the flame passing over its surface and by radiation from a low roof or arch. Modern reverberatory furnaces are long and may accommodate a very large charge. For fifty years or more it has been the custom to produce in the reverberatory furnace a matte consisting principally of a mixture of copper and iron sulfide, charge this matte into a Bessemer-type converter, blow air through it to produce a partly refined copper, and then to purify the partly refined copper in some kind of refining furnace.

10. Sources of copper have varied over the years, the first copper used being undoubtedly native copper. Early smelting procedures employed ores relatively rich in copper, low in impurities, and so constituted chemically as to be easy to smelt. New methods of various kinds, including particularly flotation, permitted production of concentrates of very low grade ores, and a major part of copper smelting, including the operations of the defendant, now involves the use of flotation concentrates. By means of flotation, the first important purification step is practiced through the concentration of the copper-bearing portion of the ore. The patent in suit is not concerned with the source of the copper, nor with the manner in which the copper matte is produced.

11. Converters have been modified in several respects through the last fifty or more years from the standpoint of size, the lining used, and the physical make-up of the converter, including the manner of introducing air. Bessemer converters were first employed in the steel industry to remove carbon by oxidation, but adapting the principle to copper smelting to remove iron and sulfur presented some difficulties, and the openings (called tuyeres) for admitting air were removed from the bottom to the side of the converter before full success was achieved. Converters were first upright or vase-shaped, but the later adopted barrel type is now used almost exclusively. The first converters were very small, but the size was gradually increased until modern converters of the barrel type will hold a hundred tons or more of metal. The converters at the Copper Queen smelter, Douglas, Arizona, in 1928 held a maximum twenty tons of metal. Converters have been lined with either acidic or basic type refractory materials, the former entering into chemical reaction with the molten mass in the converter, and the latter being for all practical purposes inert.

12. The operation of the converter has, in general, been considered as falling into two stages. In the first or so-called slag-forming stage, the iron portion of the iron-copper-sulfide matte is oxidized to iron oxide, the sulfur escaping as sulfur dioxide ($SO_2$), and the iron oxide reacts with silica to form an iron silicate slag which is poured off to remove iron and leave a product consisting mostly of copper sulfide, known in the art as "white metal". When silica-lined converters were used, the silica in the lining was consumed in forming the iron silicate slag. When a basic-lined converter is used, silica is added in sufficient quan-

tity to form the iron silicate. Such silica is added through the mouth of the converter by a traveling crane using a boat, or by a Garr gun which blows a stream of silica into one end of the converter. About 1950, addition of silica by a conveyor system in which the silica was dropped into the converter while it was in the stack (upright) was adopted by the defendant in its Hurley, New Mexico, plant, but this practice was unknown before that time. The slag formed and removed during the first period or slagging stage, while comprising essentially iron silicate, may contain other impurities and some copper. This slag is normally charged back into the reverberatory furnace where the matte is produced.

13. During the second stage operation in the converter, the molten white metal, consisting principally of copper sulfide, is further blown to form metallic copper and sulfur dioxide ($SO_2$), which escapes as a gas. As metallic copper is produced, it forms a separate layer below the white metal. Precious metals will selectively pass from the white metal to the copper by a process known as partition and, according to some practices, this copper is drawn off and further treated—this practice being known as selective converting. The more common practice is to continue oxidation of the entire mass to convert all of the copper sulfide to copper and copper oxide. The disappearance of copper sulfide as an observable separate phase is coincident with what is called "regal" copper, after which the mass goes to what is called "clear" copper, in which there is a substantially homogeneous metal product consisting of copper with certain non-copper materials dissolved therein.

14. As white metal is oxidized to metallic copper and sulfur dioxide, there is no appreciable formation of copper oxide as such, because as fast as copper oxide is formed it is reduced to metallic copper. After the white metal, or copper sulfide, as a separate phase has disappeared and the sulphur present is dissolved in the liquid copper, further oxidation and removal of sulfur as $SO_2$ causes oxygen to be introduced, and as the sulfur content of the liquid decreases the oxygen content increases. As the sulfur begins to reach a very low value, the excess of oxygen appears as copper oxide—a separate liquid phase which floats on the top of the copper bath.

15. Modern copper smelting at the time Redmond entered the field, used a reverberatory furnace into which the copper ore concentrate was charged and copper matte produced; a converter in which the matte was bessemerized to remove principally iron and sulfur and in which the copper was oxidized to a point past the "clear copper" condition; and a finishing furnace in which the final oxidation-refining of the copper was carried out.

16. Converters were then and still are commonly of the barrel type with a configuration identified as the Pierce-Smith type of converter. Defendant used and still uses this type of converter. Defendant's converters will hold up to a hundred tons or more of metal. They are equipped with a conveyor system for introducing substantial quantities of silica flux through the mouth of the converter while it is in the stack, which is the air-blowing position.

17. Converters generally were then operated to produce copper in the high blister range, although there was also a practice of blowing the copper to pea hole copper or flat copper through a practice known as overblowing. When copper was overblown, up to several per cent of the copper was oxidized during the air-blowing oxidizing procedure to produce copper oxide which appeared as a separate phase floating on top of the bath. When granulated slag was present it was liquefied by the copper oxide and a supernatent liquid slag produced, commonly called an oxide slag. The practice was to pour off this layer of oxide slag and transfer it to another converter in which the oxidizing process was not so far advanced. Oxide slag and copper sulfide react explosively, so that transfer back of the oxide slag was dangerous and had to be handled

carefully. The copper oxide slag is also corrosive to basic converter linings, particularly at the relatively high temperatures commonly used in overblowing, usually in excess of 2300°F and sometimes up to 2600°F.

18. When the oxide slag was removed, the copper was transferred to a finishing furnace for poling. If the granulated slag was all removed before overblowing began, then the entire contents of the converter, including the separate phase copper oxide, was transferred to the finishing furnace for poling. Overblown copper sometimes required a minor amount of blowing in the finishing furnace, but only a minor amount of blowing for clean-up was required in such case.

19. A variation of the overblowing method was sometimes employed in which the copper was removed from the converter at the clear copper stage and charged into an oxidizing furnace which was gas fired to retain heat of the charge, and equipped with a smaller number of tuyeres than the converter. Air was blown through the tuyeres until about five per cent of the copper was converted to copper oxide, and the sulfur removed substantially completely by oxidation. This oxidized copper was then transferred to a finishing and casting furnace for poling and casting.

20. The more common method at the time Redmond entered the field was to refine the copper to the blister stage in the converter, and complete the refining process in the finishing furnace by further air blowing at a reduced rate.

21. Finishing furnaces employ a relatively small number of pipes or "lances" to introduce air under pressure for final oxidation and purification of the copper. The oxidation thus carried out is slower, taking up to five hours or more for a single charge; but the controlled oxidation, while saturating the copper with copper oxide, does not form appreciable or dangerous amounts of copper oxide as a separate phase. After completion of the air-blowing oxidation treatment called "fire refining", the copper is poled to reduce its oxygen content. Overblown copper re-

quires little or no fire refining, but is transferred to a fire refining furnace or similar vessel for such further refining as is required, after which it is poled.

22. At the time Redmond entered the field no method was known for quickly removing from the mass the last traces of sulfur and the like impurities. Particularly, no method was known for removing impurities quickly and without forming substantial amounts of copper oxide. The only known method of purification and refining was by oxidation, and there were only two general courses open to the smelter, namely either to remove the copper from the converter at an early stage before copper oxide was formed as a separate phase and complete the refinement in the fire refining furnace, or to continue oxidation and refining in the converter or a separate vessel and produce an excessive quantity of copper oxide, with its attendant disadvantages. Both courses had disadvantages, and the only way open to the industry before Redmond's process was to attempt to control conditions so as to minimize the disadvantages of the course chosen. One such method was by the use of a separate oxidizing furnace to which the copper was transferred from the converter and before it was delivered to the fire refining or anode furnace. There is not evidence that a separate oxidizing furnace was ever used by the defendant, nor evidence that such use was widespread in the industry.

23. The patent in suit, Redmond Patent No. 2,895.821, is for a process for refining copper in the converter. It bridges the problem of either overblowing the copper with its attendant disadvantages, or underblowing the copper in the converter and finishing the refining process over a long period of time in a finishing furnace. By the Redmond process, substantially fully refined copper can be produced in the converter without forming an oxide slag, such as occurs in the overblowing procedure. Redmond's process forms no liquid or high copper slag which must be transferred to another converter. The copper produced by the Redmond process may require very

little or no further refining in the fire refining furnace, but does require poling to reduce its oxygen content, as does any refined copper.

24. In the patented Redmond process, oxidation is carried out in the converter in the usual manner by blowing air through the tuyeres up to the blister copper stage, and to and through worm stage. In a converter holding 75 to 100 tons of blister copper, this requires only a few minutes. The temperature of the copper is maintained optionally between about 2050°F and 2250°F, and preferably at about 2150°F. A substantial proportion of silica flux, preferably between 2% and 5% of the weight of the copper, is added to the bath while blowing continues and until a solid coherent coating of silica flux and granulated slag is formed. This coating absorbs substantial proportions of sulfur and some other impurities in a few minutes' time. The exact amount of blowing time required depends on the size of the charge, the blowing rate and the exactness with which the point of addition of the flux is determined. If about 75 to 80 tons of copper are in the converter, about 2½ tons of silica flux are recommended, and if the flux is added just as the worm is about to disappear, blowing time of about five minutes is required to produce a quite highly-refined copper. It is an important feature of the invention that the silica flux be added just as the worm is beginning to disappear; and the silica should be present in substantially solid form in order to perform its function of absorbing impurities. The copper refined by the Redmond process is poured out from under the solid coating and transferred for such further refining as may be required, poling, and casting.

25. There are several guides for the proper addition of the silica flux in the Redmond patented process, including control of temperature, and test of the character of the copper. By applying the silica flux just as the worm is about to disappear a highly-refined copper may be produced in the converter in only a few minutes' time after the blister copper stage is reached. In addition to tests, the worm stage can be determined by the sparks as described in the patent, and blowing time is preferably continued until the gaseous flames from the molten mass are substantially completely transparent.

26. The Redmond process accomplishes in the converter in a few minutes' time such removal of sulfur and like impurities as might require several hours in the fire refining furnace. Sulfur is removed by the Redmond process by a new physical-chemical process, and not by mere oxidation, which was the only known method of removing sulfur prior to Redmond. Unlike the overblowing technique, as exemplified by Mitchell Patent No. 705,109, the Archibald article, and the overblowing technique explained within the Redmond patent, the Redmond process does not produce substantial percentages of copper oxide as a separate phase, a result which would be obtained if oxidation were the physical-chemical mechanism of the Redmond process. There is reason to believe, based on the testimony of Dr. Dean, that two liquids are formed at the temperatures and under the conditions of the Redmond process; that one of these liquids is rich in sulfur and is dispersed in the second liquid containing very little sulfur; that the disperse liquid rich in sulfur is absorbed by the silica coating and that the sulfur is removed very rapidly because of this absorption. The Redmond process relies on a mechanism distinctly different from mere oxidation.

27. In the Redmond patent the sulfur dissolved in the partially refined or blister copper is stated to be "free sulfur". The court cannot find from the evidence that the sulfur is free but it is in solution in the copper and does not appear as a separate phase, as does copper sulfide during the early periods of purification of the white metal.

28. The silica flux applied in the Redmond process is not to be confused with other forms of slag coatings. When a converter is blown to the blister copper stage and beyond a slag known as granulated slag usually forms. This is a prod-

uct in the form of discrete balls, usually containing a nucleus of silica but comprising mostly magnetite. Granulated slag does not have the chemical or functional characteristics of the Redmond coating containing silica flux and such granulated slag as might be present when the silica flux is added. The Redmond coating is also entirely different from so-called oxide slag, which is a liquid mixture of granulated slag and copper oxide. The use of a dam at the mouth of the converter to hold back the slag when the copper is poured from the converter also differs entirely from a functional standpoint from the Redmond coating. There is no evidence that any slag formed in the converter or any other vessel in accordance with any prior art process has the same function and result as the silica flux coating employed in accordance with the Redmond patent.

29. No prior art patent or publication cited by the defendant shows a process by which pea hole copper may be made in the converter without at the same time producing an oxide slag. A new process involving these steps, however, is disclosed and claimed in the Redmond patent.

30. No prior art patent or publication shows a process including the steps of blowing the copper mass in the converter past the blister stage, adding a silica flux while continuing the air blow, air blowing until the silica flux solidifies and absorbs sulfur and the like impurities from the copper, and then pouring the resulting refined copper out from under the solid coating. A new process involving these steps, however, is disclosed and claimed in the patent in suit.

31. No prior art patent or publication shows a process by which copper is processed in the converter through the blister stage and to a late worm stage, the temperature controlled to between 2050°F and 2250°F, a substantial amount of silica flux added to the converter while blowing is continued until the silica flux forms a solid coating with the granulated slag and impurities in the copper are absorbed thereby, and a resulting highly refined

copper comparable to the product obtained by fire refining is poured out from under the said solid coating. A new process involving these steps, however, is disclosed and claimed in the patent in suit.

32. No prior art patent or publication shows a process in which blister copper is refined in the converter to and through the worm stage, and which includes the steps of maintaining the copper mass at a temperature between about 2050°F and 2250°F, adding a silica flux thereto when the sparks therefrom have the appearance of breaking or bursting, continuing the air blow until the gaseous flames from the molten mass are substantially completely transparent, and then drawing off the refined copper from underneath the solid coating which forms. A new process involving these steps, however, is disclosed and claimed in the patent in suit.

33. No prior art patent or publication shows a process by which copper is processed in the converter through the blister stage and to a late worm stage, the temperature controlled to between 2050°F ond 2250°F, a substantial amount to silica flux added to the converter while blowing is continued until the silica flux forms a solid coating with the granulated slag and impurities in the copper are absorbed thereby.

34. No group of patents or publications of the prior art shows a process which is functionally equivalent to the patent in suit, in that all of the prior art patents and publications utilize purification procedures based upon the direct oxidation of sulfur and the like impurities with oxygen brought into contact with the molten copper mass by blowing air therethrough. The patent in suit accomplishes the final purification in the converter by absorbing the impurities into a coating of silica flux introduced just as the worm is about to disappear. It would not be obvious to combine various steps from prior art publications to accomplish the patented process. Considering all of the contents of the prior art publications, no combination of any of the steps of the cited publications would

accomplish the function and results of the patent in suit.

35. The Mitchell patent was issued almost sixty years ago and there is no evidence that it has gone into general use in the industry except possibly at Cananea, Sonora, Mexico, as testified to by the witness Kuzell. It is a process involving overblowing of the copper in the converter, in which one to five per cent of the copper is oxidized to copper oxide.

36. Mitchell's purpose was to improve a process used at the time by which matte was produced in the reverberatory furnace, blister copper was produced in the converter, the blister copper cast into pigs or bars, and these pigs or bars later charged into a reverberatory furnace and melted with agitation, to introduce air to accomplish the final finishing. Mitchell disclosed blowing the copper in the converter to a relatively high stage of refinement, in which process up to 5% of the copper was oxidized to copper oxide, and then charging the resulting overblown copper into a reverberatory furnace for poling. In the poling process, a layer of charcoal was placed over the molten mass, and a pole of green wood was then inserted into the mass. Mitchell disclosed that it was advantageous to transfer the charges of more than one converter to the reverberatory furnace for poling.

37. Mitchell does not disclose adding a substantial amount of silica flux to his charge at about the worm stage. There is nothing in the Mitchell patent to suggest that the silica lining in his converter would produce a coating equivalent to the Redmond coating. Offerhaus indicates that such silica lining as might be removed during finish would form a copper silicate with the copper oxide, and this would not produce the same results as Redmond's silica flux coating.

38. Mitchell does not refer to the presence of slag in his process at any time except during the first period of operation, which is the iron slag forming stage.

39. Nothing disclosed in the Herreshoff patent or Offerhaus article would suggest revising the practices disclosed in the Mitchell patent to produce the Redmond patented process.

40. Not only does Mitchell fail to disclose the steps of the Redmond patented process, but there is nothing disclosed in Mitchell or a combination of the art cited by the defendant which would suggest to one skilled in the art the steps of the Redmond patented process and the overall result to be obtained thereby.

41. Herreshoff discloses forming a silicious material in the reverberatory furnace comprising principally copper silicate, and the use of such copper silicate silicious material to slag off the iron during the first or slagging stage in the converter.

42. Herreshoff was working with relatively small converters with a relatively large surface-to-volume ratio, so that heat losses were relatively high. He was apparently also working with a relatively high grade of copper ore in which the iron was insufficient to produce large amounts of heat by exothermic reaction during oxidation thereof in the slag forming stage. He was concerned, therefore, with conserving heat, a necessary procedure unless heat were to be added from an exterior source to prevent freezing of the copper in the converter.

43. Herreshoff disclosed adding his silicious material to the copper mass at a suitable stage to extract heat therefrom which would be available for the next charge placed on top of the already heated silicious material. He gave two examples: one in which he used an excess of silicious material during the iron slag forming stage, and the other in which the silicious material is placed on top of the blister copper "immediately before the copper is poured" to extract heat therefrom for use in a second charge. In each instance the copper material, either white metal or blister copper, is poured out from under the silicious material, but the silicious material is inert and not affected chemically by the bath, although heated thereby.

44. There is no evidence that the Herreshoff patented process ever went

into actual commercial use. If it did, it was concerned only with a specific problem involving the use of small converters and did not produce the results of the patented Redmond process.

45. There is nothing in the record to show any part of the Offerhaus article (DX–W) could be interpreted as describing the patented Redmond process, notwithstanding the fact that Offerhaus discusses various aspects of copper smelting and particularly converting as they were practiced by the Anaconda Copper Company in 1908. Defendant equates the copper with a blackish surface referred to by Offerhaus with worm copper, and this appears to be the only basis for any asserted similarity between Offerhaus and Redmond. If Offerhaus' black blister is the same as worm copper, it does not follow that the process described by Offerhaus is the same as the process described and claimed in the Redmond patent when the clear text shows that Offerhaus does not use the basic features of the Redmond process, namely a relatively heavy charge of silica flux at the worm stage with continuous blowing for a period of five minutes or so to spread and solidify the silica flux and absorb the impurities in the copper, specifically the sulfur, into the coating.

46. The Levy article on which defendant relies to show invalidity of the Redmond patent in accordance with its notice under Section 282 of Title 35, United States Code, is merely a compilation of various practices in the smelting of copper in the year 1912 at the time the article was published.

47. The Levy article describes barrel type and upright type converters, silica lined and basic lined converters, converters as small as five tons' capacity, and relatively large (at the time) barrel type converters. Various converter practices and modifications thereof are also disclosed. Nowhere is there shown or suggested the idea of introducing a silica flux at or about the worm stage under the specific conditions described in the Redmond patent and the absorption of impurities in the coating formed by the silica flux.

48. As filed, the Redmond patent disclosed the invention covered in its three claims. The amendment of the specification and claims did not introduce matter which was not either clearly disclosed in the words of the specification and claims or inherent in the disclosure, such that those skilled in the art would understand the meaning. The patent examiner at no time requested that a supplemental oath be filed.

49. The Redmond patent in suit is not ambiguous or lacking in meaning to those skilled in the art but, on the contrary, clearly teaches those skilled in the art the manner in which the claimed invention is practiced, as required by the patent statutes. The reference to oxygen in the patent, and the failure to disclose that the patented process does not remove oxygen, does not cause the patent to be obscure because those skilled in the art are well aware that during the period in which oxygen is introduced it is classified as a reagent, and may be removed to the extent required by poling. Reference to flat copper is not ambiguous, because those skilled in the art would know that flat copper as identified by the patent is unpoled flat copper. No one skilled in the art would assume that the Redmond process would remove oxygen, and the patent is not ambiguous for this reason.

50. Redmond himself conceived the invention of the Redmond patented process, and he did not derive the conception from any other person. Conversations which Redmond had with his brother and others, however, may have been instrumental in his conceiving his invention by their narrating to him observations which stimulated his inventive faculties.

51. The alleged admission by Redmond's attorney Royall that the invention which he sought to patent had originated in Belgium is not a document which cannot be overcome by the weight of the evidence. Royall's letter alleged to contain the admission did not specifically identify what part of the disclosure originated in Belgium, and there is no specific

statement that the process sought to be patented, as it was later fully explained to the Washington attorneys, was the invention of anyone other than Redmond.

52. The attempt to remove selenium in accordance with Redmond's suggestion in August, 1949, was an abandoned experiment and there is no specific evidence to show that it employed specifically the features of the patented Redmond invention.

53. The uncontroverted testimony of the inventor Redmond is to the effect that he experimented rather extensively with the patented process while he was employed by defendant at its Hurley plant, a circumstance which tends clearly to indicate that Redmond was in actual fact the conceiver of the idea and that he was not basing his invention on specific disclosures received through his brother. Redmond also testified that what his brother told him concerned seeing a blackfish coloration on a silica dam used at the mouth of the converter to hold back the slag when the converter was poured, and the speculation that this blackish coloration indicated that the silica had picked up some material from the copper. Since copper itself sometimes shows a blackish color, as shown by the Offerhaus article, this blackish coloring could be copper in a particular stage of purification. Nothing in Luther Redmond's disclosure indicates that the blackish coloring could have been caused by sulfur, so far as the records of this case go. From all of the facts it appears that Gene Redmond actually conceived his patented invention and reduced it to practice while he was employed at defendant's Hurley plant. Defendant has not carried its burden of showing that the invention did not originate with the patentee.

54. Defendant did not carry its burden of showing that the subject matter of plaintiff's patent in suit, and all of the material and substantial parts thereof were for more than one year prior to the date of his application patented or described in any printed publications or patents cited by defendant.

55. Defendant did not carry the burden of proving its second defense in which it alleged that the subject matter of the Redmond patent differs so little from the prior art that it would be obvious to one skilled in the art to utilize the features of the Redmond invention. The weight of the evidence is to the effect that the process of the Redmond patent differs qualitatively from prior art processes, and that it would involve invention to conceive and reduce it to practice.

56. Defendant has not carried its burden of showing that the specification and claims of the patented Redmond process include new matter absent from the application as filed. The weight of the evidence at the trial sustains a finding that no new matter was introduced, but that the patent as issued covered the same invention as that disclosed in the application as filed.

57. Defendant has not met its burden of showing by clear and convincing proof that the patented invention is different from the invention as disclosed in the application as filed.

58. Defendant has not carried its burden of showing that claims were obtained which represent an improper and unlawful securing of a monopoly not known to the applicant and inventor at the time of filing his application.

59. Defendant has not met the burden of proving its seventh defense because it has not shown that patentees and authors of patents and publications cited by it were actually the inventors of anything claimed in the Redmond patent in suit.

60. Defendant has not carried its burden of proving its eighth separate defense because it has not introduced any evidence to show that the invention was publicly used in this country for more than one year prior to the filing of the Redmond patent application.

61. Defendant has not sustained the burden of proving its ninth defense because no evidence has been submitted showing that plaintiff is now, or was at any time, required to file a disclaimer of

claims 1 and 2 of the Redmond patent in suit.

62. Defendant has not sustained the burden of proving its tenth defense because it has not shown that the Redmond patent in suit is vague and indefinite and fails to comply with Section 112 of Title 35, United States Code.

63. Defendant has failed to carry the burden of proving its eleventh defense because it has failed to show by a preponderance of the evidence that the claims of the patent are broader than the disclosure of the application as filed.

64. Defendant has failed to carry the burden of proving its twelfth defense because it has failed to show that the invention of the Redmond patent as covered by its claims was not disclosed in its original application.

65. Defendant has not carried the burden of proving its thirteenth separate defense because it has not shown that the patentee was at any time required to file a supplemental oath or statutory oath of any kind other than the oath filed with the application in accordance with the statutes.

66. Defendant has operated a smelter at Hayden, Arizona, through its Ray Mines Division, and it is at such smelter that defendant is charged with infringing the Redmond patent.

67. On February 14, 1961, representatives of plaintiff and defendant witnessed at the Hayden smelter the completion of a charge in one of defendant's converters. Plaintiff contends that the operation witnessed on February 14, 1961, was characteristic of defendant's usual converter operations at Hayden and, in actuality, bases its claim of infringement upon defendant's activity at Hayden on February 14, 1961.

68. In the operation of the converter on February 14, 1961, successive charges of matte were charged into the converter and the iron was slagged off until a charge of about 100 tons of white metal was built up. The white metal was then blown on finish to the blister copper stage, when silica flux was added by means of an overhead conveyor system for about one minute. Thereafter the converter was in the stack and air was being blown intermittently into the converter for about 6½ minutes, when additional silica was added; and about 45 seconds thereafter the copper was poured out of the converter.

69. Samples of the copper produced on February 14, 1961, were identified as samples of worm copper or as "between blister and worm" copper.

70. During the operation of February 14, 1961, the silica flux was added to the mass in the converter at the blister copper stage and not either as the worm was about to disappear or when the sparks from the molten mass began to have the appearance of breaking or bursting. Further, the blow was not continued until the silica flux formed a solid coating over the mass, nor was the copper poured from under the solidified silica, but the silica was used as a dam at the mouth of the converter to hold back the granulated slag while the copper was poured from the converter. Further, air was not blown through the mass through the worm stage nor was the copper refined through the worm stage. Finally, the court does not find that the copper in the converter on February 14, 1961, contained free sulphur.

## CONCLUSIONS OF LAW

1. This court has jurisdiction over the parties to this action and the subject matter thereof.

2. The Redmond Patent in suit was duly and legally issued in accordance with the requirements of Title 35, United States Code, and it was not necessary that Redmond file a supplemental oath with respect to the claims of the patent, as amended.

3. Redmond Patent No. 2,895,-821 and each of its claims are good and valid in law.

4. In determining whether a valid patent is infringed, infringement is made out if the accused process performs the same function in substantially the

same way as disclosed by the patent and falls clearly within the language of the claims.

5. Defendant's commercial process as carried on in its Hayden smelter does not infringe any of the claims of Redmond Patent No. 2,895,821.