445 P.2d 162

SAN MANUEL COPPER CORPORATION, a
Delaware Corporation, and Magma Copper
Company, a Maine Corporation, Appellants,

v.

Eugene R. REDMOND, Appellee.

No. I CA–CIV 66I.

Court of Appeals of Arizona.

Sept. 12, 1968.

Rehearing Denied Oct. 9, 1968.

Review Denied Nov. 19, 1968.

---

Twitty, Sievwright & Mills, by George Reeves, Phoenix, Evans, Kitchel & Jenckes, by Joseph S. Jenckes, Jr., Phoenix, for appellants.

Drummond & Cahill, by William H. Drummond, Phoenix, Evans & Kunz, by Donald R. Kunz, Phoenix, for appellee.

CAMERON, Chief Judge.

This is a suit for unjust enrichment by reason of prepatent use by defendants-appellants, San Manuel Copper Corporation and its successor in interest Magma Copper Company. From a jury verdict and judgment in the amount of $400,000 in favor of the plaintiff, Redmond, the defendants bring this appeal.

Defendants list some 22 "questions presented for review". However, a reading of the briefs and transcript indicates that we are called upon to determine the following 5 questions:

1. Whether the complaint states a claim upon which relief can be granted.

2. Whether the action was barred by the statute of limitations.

3. Whether a judgment in a prior action in the federal court on the patent

rights is binding upon the defendants in a suit for unjust enrichment (collateral estoppel).

4. Whether the admissible evidence justifies the verdict.

5. Whether the admissible evidence justifies the amount of the damages.

Plaintiff, Eugene Redmond, went to work for San Manuel as a converter shift foreman when the smelting plant opened in 1956. Prior to his employment at San Manuel, plaintiff was employed in a similar position at the Kennecott Mine in Hurley, New Mexico. While at Hurley plaintiff devised a new process, the "Redmond Process", which he contends resulted in a great savings in the smelting of copper ore.

Appellants in their opening brief explain the extractive metallurgy of copper as follows:

"Copper ore containing less than one percent copper in copper-iron-sulfides is crushed and ground. By a process known as flotation, the copper-iron-minerals are separated from the waste to form a concentrate containing approximately 30 percent copper. The concentrate is charged into a stationary reverberatory furnace,

where it is flame melted. The copper-iron-sulfide material, called matte, containing about 33 percent copper, sinks to the bottom of the molten pool, while the lighter slag rises to the top and is skimmed off. The matte is tapped out of the reverberatory furnace into a ladle and transferred by overhead crane to a converter.

"A converter is a rotating horizontal cylindrical furnace * * * which derives its heat from the air oxidation of the sulfide and iron of the matte. In the converter, the operation is performed in two periods, known as the 'slagging period' and the 'finish period'. In the slagging period, silica flux is added and air is blown through the molten matte forming sulfur dioxide which passes off as a gas. The iron is oxidized and, to-

gether with the silica flux, forms a slag, which is skimmed off. At the end of the slagging period, most of the iron has been oxidized, leaving molten copper sulfide, or 'white metal'. Any one of several 'processes' may be used in the finish period to reduce the white metal to metallic copper. * * * When the copper has reached the desired stage, it is poured into a ladle and transferred by overhead crane to an anode furnace. In the anode furnace, the copper is further oxidized and refined by 'piping', an operation which consists of blowing air into the molten copper through lengths of $3/4$-in. iron pipe or 'lances'. Then it is 'poled' to reduce the oxygen content, an operation which formerly entailed the use of green logs or 'poles', and later has been accomplished by the use of reformed natural gas. The copper is then cast into anodes, which are loaded on railway cars and shipped to the electrolytic refinery for further processing. The purpose of the anode furnace processing is to produce smooth, nonblistery anodes of uniform dimensions suitable for handling and electrolytic refining."

The Redmond Process was one of the "several processes" referred to by appellants that could be used in the finish period. The process consisted of adding silica flux in the finish period and is more fully described in the case of Brian Jackson Associates, Inc. v. San Manuel Copper Corp., D.C., 259 F.Supp. 793 (1966). This federal case involved litigation over the same matter for patent infringement for the period after the patent was issued and was affirmed in San Manuel Copper Corporation v. Brian Jackson Associates, Inc., 384 F.2d 487, 9th Circuit (1967). See also Brian Jackson Associates, Inc. v. Kennecott Copper Corp., D.C., 260 F.Supp. 679 (1962).

After plaintiff commenced work at the San Manuel Mine, he experimented with his process several times. He also instructed one of the employees under his control in the use of his process. That em-

ployee terminated his employment at San Manuel in May of 1957.

In June of 1957 plaintiff pursuant to instructions from his patent attorneys met with Frank Buchella, the General Manager of the San Manuel Copper Corporation, and presented a paper which described his process. The advice plaintiff had received from his patent attorneys urged him to negotiate a sale of his invention while the application for the patent was still pending. In the conference with Buchella, no arrangements as to compensation were made. Instead Buchella said he did not understand the process but that he would send the paper describing the process to Bob Wilson, the smelter superintendent, and Luther Redmond, the smelter general foreman (and plaintiff's brother). Buchella indicated it would be up to those people to decide. In the meantime, plaintiff was authorized to proceed with using his process and to teach the other converter foremen in the use of the process. Prior to that time two other processes had been used at the San Manuel Plant, the overblowing process and the blister process. Within a year the Redmond process was being used exclusively.

There never were any negotiations for compensation to plaintiff for the use of the process. The only subsequent conversations testified to were plaintiff's with Bob Wilson, the smelter superintendent, first in September or October of 1957 and again in December of 1958. In the December conversation of 1958 Wilson told plaintiff to get his patent first then they would discuss compensation. The patent issued on 21 July 1959. Plaintiff was never compensated for his process and his employment was later terminated. Subsequently, plaintiff brought this suit for unjust enrichment for the period between June 1957 and October 1958. In October of 1958 plaintiff assigned all his rights to his process to Brian Jackson Associates, Inc., and the use after October 1958 is the subject of the federal court action reported in 259 F.Supp. 793, op. cit.

## SUFFICIENCY OF THE COMPLAINT

Plaintiff's amended and supplemental complaint alleged that after plaintiff was employed at defendants' smelter he "introduced to said smelter" a new and useful process which he had previously discovered and referred to as the "Redmond Process". The complaint further alleges that defendants permitted the use and accepted the benefits and enrichment thereof and the defendants were thereby unjustly enriched. It is the contention of the defendants that this does not state a claim upon which relief can be granted, and that defendants' motion to dismiss should not have been denied in the absence of an allegation of some fact,

"such as fraud, mistake or breach of confidential relationship—disclosing that the alleged enrichment is unjust or that a promise to pay may be implied under the theory of quasi contract."

Defendants further contend that the State of Arizona could not grant such relief as it "encroaches upon the plenary power of Congress to grant monopolies to inventors pursuant to Article I, Section 8 of the United States Constitution."

It has generally been held that an inventor of a new, useful, and unique process may sue for the unauthorized use of said invention:

"An inventor has a natural right, recognized by the common law, separate from, and independent of, any constitutional or statutory provision, or any patent grant, to make, use, and sell his invention or discovery." 69 C.J.S. Patents § 2, page 162.

In enforcing his common law rights the inventor is not restricted to use of the federal courts for a determination of these rights and damages accruing therefrom. Bandag, Incorporated v. Morenings, 259 Iowa 998, 146 N.W.2d 916 (1966). One of the leading cases on this subject states:

"The doctrine of unjust enrichment or recovery in quasi-contract obviously does

not deal with situations in which the party to be charged has by word or deed legally consented to assume a duty toward the party seeking to charge him. Instead, it applies to situations where as a matter of fact there is no legal contract, but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain, but should deliver to another. (citations omitted) * * * The doctrine is applicable to a situation where, as here, the product of an inventor's brain is knowingly received and used by another to his own great benefit without compensating the inventor." Matarese v. Moore-McCormack Lines, 2 Cir., 158 F.2d 631, 634, 170 A.L.R. 440 (1946).

Reading the amended and supplemental complaint in its entirety we believe that the complaint gives the defendant ample notice of the nature and basis of the claim, and that if true the plaintiff would be entitled to relief:

> "The court should not grant a motion to dismiss unless it appears certain that the plaintiff would be entitled to no relief under any state of facts which is susceptible of proof under the claim stated. * * * The purpose of the foregoing rule is to avoid technicalities and give the opponent fair notice of the nature and basis of the claim and indicate generally the type of litigation involved. (citing authority) We have no difficulty in saying that, assuming the truth of the statements set forth in the complaint, the defendant obtained and illegally retained funds belonging to the plaintiff, and the defendants by the statements are given fair notice of the nature of the litigation. The court correctly denied the motion to dismiss." Mackey v. Spangler, 81 Ariz. 113, 115, 301 P.2d 1026 (1956).

## STATUTE OF LIMITATIONS

 The defendants next contend that the matter was barred by the statute of limitations. Plaintiff's original complaint was filed on 6 December 1960 and the amended and supplemental complaint was filed on 2 October 1964. Both complaints alleged that defendants used the Redmond Process starting on 6 January 1956. At that pretrial conference, the plaintiff amended the complaint to allege that the defendants started using the process in June 1957, the time plaintiff had his conversation with Frank Buchella, defendants' general manager. A plea of the statute of limitations is not favored in the law, and where the question of which statute to apply is before the court, the longer period of time must be given the effect. Continental Casualty Company v. Grabe Brick Co., 1 Ariz.App. 214, 401 P.2d 168 (1965). In the instant case where it is not clear which statute, A.R.S. § 12–543, 3 years for oral debt and fraud and mistake, or A.R.S. § 12–550, 4-year general limitation, we would have no difficulty in finding that a suit for unjust enrichment for pre-patent use of an invention is controlled by A.R.S. § 12–550, the four-year statute, and that the amendment at the pre-trial hearing related back to the filing date of the filing of the complaint. Rule 15(c), Rules of Civil Procedure, 16 A.R.S. However, we do not have to determine this as the trial court properly instructed the jury in this matter (though using the three-year statute) as follows:

> "If you find upon all of the evidence herein that Eugene R. Redmond had reason to believe after the occasion upon which Robert Wilson, defendants' smelter superintendent, told him in approximately September, 1957, that the Redmond process consisted only of 'adding a little silica,' or words to that effect, that defendants had then finally repudiated their obligation, if any, to pay him for the use of his process, then plaintiff's claim is barred by limitations and you will return a verdict for the defendant.

> "If, on the other hand, and upon all of the evidence herein, you find that Eugene R. Redmond continued to have a reasonable belief that he would ultimately be

compensated by defendants for the use of his said process and that such obligation, if any, was not finally repudiated by the defendants until a date after December, 1957, then the statute of limitations has no application herein and you will find against the defendants as to the defense of the statute of limitations."

We believe the instructions were properly based on the evidence and the jury having found (we believe properly) that the statute did not apply, we find no error.

## COLLATERAL ESTOPPEL

██ Defendants next contend that the judgment rendered against the defendants in a patent infringement case in the federal court together with the court's memorandum decision and findings of fact and conclusions of law did not collaterally estop the defendants from challenging the utility, newness, and novelty of the invention where the plaintiff was not a party to the patent infringement suit. The plaintiff had assigned his rights to Brian Jackson Associates of which he was the President, Director, and principal stockholder, and it would appear that Brian Jackson Associates was actually Eugene Redmond's alter ego. It would therefore appear that the defendants' objection that there was no privity is not well founded. Who are privies in a prior suit is ordinarily a question of fact requiring examination of the circumstances in each case. Brandt v. Brandt, 76 Ariz. 154, 261 P.2d 978 (1953). A corporate officer who has control over the litigation in the corporate name would be subject to collateral estoppel or res judicata if the same action for facts determined were to be used by him personally. Towle v. Boeing Airplane Company, 364 F.2d 590, 8th Circuit (1966). And there is a question whether absolute mutuality is necessary in a case of this kind. It is the opinion of some authorities that there is no need for mutuality when the person who is attempting to defeat the estoppel or res judicata has already had his day in court. See Desmond v. Kramer, 96 N.J.Super. 96, 232 A.2d 470 (1967), DiOrio v. City of Scottsdale, 2 Ariz.App. 329, 408 P.2d 849 (1965). In the instant case the defendants, having appeared and defended on the very issue of fact being discussed in this case, are in no position to challenge the applicability of the previous case.

## DID THE EVIDENCE JUSTIFY THE VERDICT FOR THE PLAINTIFF?

██ It is the contention of defendants that plaintiff is not entitled to a verdict and judgment. Defendants raise many points including lack of fraud plead and proved on the part of the plaintiff, and the instruction by the court that defendants "received such idea or process within a relationship of trust and confidence." We do not believe it is necessary to show fraud in order to recover for unjust enrichment in the prepatent use of an invention or idea. From a reading of the evidence we think there is sufficient evidence to show that there was a relationship of trust and confidence between the plaintiff and defendants.

██ The idea need not be communicated expressly "in confidence" because the facts of the situation can indicate that the employment relationship made the communication tacitly confidential:

" * * * If a person communicates a novel idea to another with the intention that the latter use the idea and compensate him for such use, the other is liable for such use and must pay compensation if actually he appropriates the idea and employs it in connection with his own activities. It is immaterial whether the communication is expressly made in confidence, so long as it is made on an understanding either tacit or express that the person communicating the idea, or the owner of the idea, expected to be compensated if it was to be used by the person receiving it. * * *

* * * * * *

"It may well be that the defendant honestly and in good faith thought that he was entitled to do what he did. He

is not being charged with fraud, actual or constructive. The issue is not one of good or bad faith. Good faith is immaterial. The question is whether the defendant has been unjustly enriched by using the plaintiff's idea, and should pay compensation therefor ex aequo et bono." Trenton Industries v. A. E. Peterson Mfg. Co., D.C., 165 F.Supp. 523, 532, 533 (1958).

■ Defendants also contend that there could be no confidential relationship because plaintiff Redmond taught a fellow-employee the process before the disclosure to Buchella. We do not agree. While prior knowledge by an agent of the defendant company might in some cases negate the later confidential disclosure it must be shown that the agent received this information in a situation wherein it was the duty to give the company the information and within the power of the agent to bind the company—this was not shown here.

## DOES THE EVIDENCE JUSTIFY THE AMOUNT OF DAMAGES?

■ Defendants next contend that the evidence does not support the amount of damages. Defendants contend that the statement of Mr. Wilson, smelter superintendent, to the effect that the Redmond Process saved the company $6.00 per ton was inadmissible as evidence against the principal coming within "idle gossip or careless talk" as discussed in Franklin v. Havalena Mining Company, 18 Ariz. 201, 157 P. 986 (1916). Mr. Wilson died before the trial and Earl Echtinaw, an assayer for San Manuel Copper Corporation, testified (over objection):

"Mr. Wilson dropped into the assay office and we talked about the Gene Redmond case, and he told me that the Gene Redmond method saved the company about six dollars a ton."

We agree with the appellants' analysis of Mr. Wilson's statement, but the statement of Mr. Wilson as to how much money the company saved per ton was not only in-admissible as being "idle gossip or careless talk", it was also immaterial to the issues involved. A reading of the cases indicates to us that the measure of damages, whether negotiated royalty or loss of profits, is determined largely by the element of willfulness. In other words, if the company willfully appropriates and uses an inventor's idea the courts generally assess damages in an amount greater than a negotiated royalty in order to discourage the user of the invention from knowingly appropriating an inventor's idea without permission under the assumption that he can always negotiate the royalty later.

■ If, on the other hand, as it would appear in the case before the Court, there is no showing of willfulness then there is no reason to punish the appropriator of the invention for a willful and unfair attitude and the negotiated royalty is the measure of damages which is usually applied. On a negotiated royalty basis, damages are set at that amount which the parties negotiating as reasonable men would have agreed upon for the use of plaintiff's process. Admittedly, an inherent weakness in such a standard is the lack of incentive it provides for negotiating before the appropriation of another's idea. The inventor may be forced to license his invention to the user at rates to be set by the court, and although the cost of litigation may provide deterrents to a potential appropriator, these same costs may assure him that the other party cannot afford to bring suit. However harsh it may appear to the inventor, in this case we do not find that degree of willfulness which would justify the imposition of the higher degree of damages. While we have read several cases which have allowed damages for unjust enrichment in a pre-patent use of an invention to be measured by the profits before and after its use, we feel that the better rule is stated as follows:

"Where no established royalty can be proved, it is permissible to show the value of what has been taken by the infringement by proving what would have

been a reasonable royalty, considering the nature of the invention, its utility and advantages, and the extent of the use involved. What is a reasonable royalty is a question of fact. * * * The primary inquiry, often complicated by secondary ones, is what the parties would have agreed upon, if both were reasonably trying to reach an agreement. There is no mathematical formula for the determination of a reasonable royalty. The property loss of a patentee from infringement may arise from such varying facts and circumstances that each case must be controlled by those peculiar to it and except in rare instances the loss can only be determined by reasonable approximation. * * *." Faulkner v. Gibbs, 199 F.2d 635, 9th Circuit (1952).

While we are aware that this is the minority rule in the United States, we believe that it is the more equitable rule under the facts as established in this case. We are not concerned with how much the defendants saved by the use of the Redmond Process. The unjust enrichment for which the plaintiff brings his cause of action is for the use by the defendants of his unique idea and process. Plaintiff is entitled to be reimbursed for this use regardless of whether the defendants make a profit off of it or not. The unjust enrichment then is the use of the process without payment.

Defendants contend that they should have been allowed to introduce evidence of other processes which would effect similar savings. With this we do not agree. We are not concerned with loss of profits or the availability of other processes. The defendants used plaintiff's process and defendants should be required to pay a reasonable amount as and for said use irrespective of what other methods might be available.

For the reasons stated the matter will have to be remanded for a determination of the damages which would be the amount as indicated in the portion of defendants' requested instruction. The plaintiff contends that he is entitled to interest on the amount and we agree, as a suit for unjust enrichment is based on the theory that the defendant has obtained or retained money that should have been paid over to the plaintiff. As part of the damages interest should run from the time of the infringement on the amount and the jury may be so instructed.

We have reviewed the other questions raised by the defendants, and we do not believe it necessary to decide them at this time.

The matter is reversed and remanded to the trial court with directions to enter judgment for the plaintiff, and to thereafter determine the amount of damages the plaintiff is entitled to receive pursuant to this opinion.

DONOFRIO and STEVENS, JJ., concur.