**BRIAN JACKSON ASSOCIATES, INC.,**
an Arizona corporation, and Melvin
S. Buros, Plaintiffs,

v.

**SAN MANUEL COPPER CORPORATION,** a Delaware corporation, and
Magma Copper Company, a Maine corporation, Defendants.

No. 3297.

United States District Court
D. Arizona.

June 30, 1966.

McLaughlin, Cahill & Drummond,
Phoenix, Ariz., for plaintiffs.

Twitty, Sievwright & Mills, Phoenix,
Ariz., Willis H. Taylor, Jr., Hal E. Seagraves, Pennie, Edmonds, Morton, Taylor
& Adams, New York City, of counsel, for
defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

LINDBERG, District Judge.

### FINDINGS OF FACT
### ADMITTED FACTS FROM PRETRIAL ORDER

1.

Plaintiff, Brian Jackson Associates,
Inc., is a corporation duly organized and
existing under the laws of the State of
Arizona. Melvin S. Buros is a resident
of Arizona, and both Brian Jackson Associates, Inc. and Melvin S. Buros are prop-

er parties plaintiff and have the legal capacity to maintain this suit.

2.

Defendants, San Manuel Copper Corporation and Magma Copper Company, are corporations duly organized and existing under, respectively, the laws of the States of Delaware and Maine and had and continued to have the legal capacity to be sued in this Federal Judicial District and were duly and legally joined as defendants in this cause.

3.

Redmond Patent No. 2,895,821 was issued on July 21, 1959, to Brian Jackson Associates, Inc.; and on the 21st day of March, 1964, Brian Jackson Associates, Inc. granted to Melvin S. Buros, his heirs and assigns, an exclusive license under said Redmond Patent 2,895,821.

4.

Plaintiff, Brian Jackson Associates, Inc., first brought suit against Kennecott Copper Corporation and San Manuel Copper Corporation jointly, but on motion the suit against San Manuel Copper Corporation, one of the present defendants, was ordered severed, after which the present action was initiated by Brian Jackson Associates, Inc. against San Manuel Copper Corporation and Magma Copper Company.

5.

Defendant, San Manuel Copper Corporation, had the legal capacity to be sued at the time the complaint herein was filed. It was, however, a wholly owned subsidiary of defendant, Magma Copper Company, but discontinued doing business in Arizona on or about April 30, 1962, and was dissolved in accordance with the laws of the State of Delaware, its corporate existence being continued for limited purposes for a period of three years from said date of April 30, 1962. Defendant, Magma Copper Company, is the transferee of all, or substantially all, of the assets and interests of San Manuel Copper Corporation and assumed its obligations and contingent liabilities.

6.

Defendant, San Manuel Copper Corporation, was duly notified of its infringement of Redmond Patent No. 2,895,821 within a few days after such patent was issued. Defendant, San Manuel Copper Corporation, however, was offered a license under the Redmond patent in suit on a royalty basis by plaintiff, Brian Jackson Associates, Inc., but declined to accept the same.

7.

Plaintiff, Brian Jackson Associates, Inc., is an Arizona corporation duly organized and existing since October 6, 1958, and has its office and place of business at 262 N. Meyer Avenue, Tucson, Arizona.

8.

Plaintiff, Brian Jackson Associates, Inc., is the owner of the record title to United States Patent No. 2,895,821 granted July 21, 1959 for "Process For Refining Blister Copper," the said patent having been issued on its face to said plaintiff as assignee of the named patentee, Eugene R. Redmond.

9.

The application for said Patent No. 2,895,821 filed May 18, 1954, Serial No. 430,725, was assigned by Eugene R. Redmond to plaintiff, Brian Jackson Associates, Inc., by an assignment executed October 13, 1958.

10.

Following the said assignment of October 13, 1958, Max E. Shirk, a duly registered patent attorney, admitted to practice before the United States Patent Office, was appointed by said plaintiff to prosecute the said then pending application on behalf of said plaintiff.

11.

Plaintiff, Melvin S. Buros, residing at 333 E. Pomona Road, Phoenix, Arizona, is the exclusive licensee under said Patent No. 2,895,821, having acquired the same March 21, 1964, from the plaintiff, Brian Jackson Associates, Inc., as own-

er of the legal title to the said patent. (By the terms of said exclusive license said Buros has the sole right to grant sublicenses under the said patent.)

12.

The original defendant in this action, San Manuel Copper Corporation, has been dissolved, but the defendant, Magma Copper Company, a Maine corporation, is doing business in the State of Arizona as San Manuel Division of Magma Copper Company at San Manuel, Arizona, where it operates a copper smelter as did San Manuel Copper Corporation prior to its dissolution, within the jurisdiction of the Phoenix Division of this court. Defendant, Magma Copper Company, has assumed all liabilities of its subsidiary, defendant, San Manuel Copper Corporation.

13.

Written notice of alleged infringement of said Patent No. 2,895,821 was given by plaintiff, Brian Jackson Associates, Inc., to defendant, San Manuel Copper Corporation, on or about July 22, 1959.

14.

Plaintiff, Brian Jackson Associates, Inc., as owner of Redmond then pending parent application Serial No. 430,725 (now granted as Patent No. 2,895,821 in suit) caused to be filed on behalf of Redmond on May 20, 1959, a continuation-in-part application of said parent application through Max E. Shirk as attorney for Redmond. The said continuation-in-part application is stated to be an improvement in the method of refining blister copper described in the patent in suit (No. 2,895,821) and was granted to said plaintiff and issued as United States Patent No. 3,114,628 on December 17, 1963.

15.

Defendants have withdrawn the First, Seventh and Eighth separate defenses alleged in their answer.

CLAIMS OF PATENT IN SUIT

16.

Redmond Patent No. 2,895,821 covers three claims, as follows:

1. In the process of refining blister copper in the converter in which it is formed which includes blowing air into a molten mass of blister copper, and continuing the air blow to the worm stage, the improvement comprising refining said blister copper through the worm stage including the steps of adding a silica flux to the mass as the worm is just about to disappear, continuing the blow until the silica flux has formed a solid coating over said mass and pouring said mass out from under said coating.

2. In a process of refining blister copper containing free sulfur in the converter in which it is formed which includes blowing air into a molten mass of blister copper, and continuing the blow until the copper is substantially free of said sulfur, the improvement comprising adding a silica flux to the molten mass of material, and continuing the air blow at a temperature not in excess of about 2150° F. until the silica absorbs said free sulfur and solidifies, and pouring the copper out from under said solidified silica.

3. A process of refining blister copper in the converter in which it is formed which comprises air blowing the same to and through the worm stage at a temperature between about 2050° F. and 2250° F., adding a silica flux to the molten mass of material when the sparks therefrom begin to have the appearance of breaking or bursting, and continuing the air blow until the gaseous flames from the molten mass are substantially completely transparent.

PRIOR LITIGATION RE VALIDITY OF PATENT

17.

In the litigation between Brian Jackson Associates, Inc. v. Kennecott Cop-

per Corporation (Civil No. 119 Globe, D.C., 260 F.Supp. 679, referred to in finding 4, supra) the issue of the validity of Redmond Patent No. 2,895,821 was fully tried before the Honorable James A. Walsh, one of the judges of this court, sitting in Tucson. Findings of fact and conclusions of law were entered on both the issue of validity of the patent as well as the issue of infringement with respect to the Kennecott operation. The patent was found valid but not infringed and the action dismissed. No appeal was taken by Brian Jackson Associates, Inc. from the judgment of dismissal in the Kennecott case.

Except for one witness the same expert witnesses gave testimony on behalf of the defendants in both cases. Both defendants have been represented by the same principal counsel although local counsel were not the same. Except for some defenses which were not urged by San Manuel the defenses in both the Kennecott and San Manuel cases are identical. Except for one reference (Ruddel, DX 16) the prior art references urged by both Kennecott and San Manuel are the same. There was no testimony concerning this reference.

In resisting a motion to consolidate this case with the Kennecott case for trial, counsel for the defendants argued to the court that the chief reason for not consolidating was the difference in the infringement issue between the two cases.

Under these circumstances the court gives substantial weight to the findings of Judge Walsh in the Kennecott case with respect to the issue of validity.

## COPPER SMELTING AND CONVERTING PROCESS GENERALLY PRIOR TO REDMOND PATENT

### 18.

The winning of copper from its ores is an art rooted in antiquity. Copper was probably first found in its elemental form, clustered in the crust of the earth. Oxides of copper were then found on or near the surface of the earth and these, it was discovered, could be reduced to copper by treating them at high temperature with coke or charcoal. As these high grade ores were consumed it became necessary to seek new sources of copper, and the sulfide ores found at lower depths of the earth provided such a source. At first these ores were rich enough to permit direct smelting, but as the rich deposits were mined out it was necessary to resort to various ore benefication procedures. These procedures separated the valuable materials from the rest of the mass, thus concentrating the ore and making it more amenable to smelting.

### 19.

Although the apparatus, sources of copper and techniques have varied extensively, the art of smelting has always included the following steps:

(a) melting the ore or concentrate;

(b) bringing the melt into contact with air to produce a relatively impure copper mass that can be separated from the stone-like material with which it is usually mixed;

(c) further contacting the copper mass with air to oxidize the mass and remove impurities in the form of slag or escaping gas;

(d) "poling" the copper to remove at least part of the oxygen introduced by the air used as a reagent to oxidize impurities;

(e) casting the copper into bars, ingots, or anodes

When steps (a) and (b) have been accomplished the product is known as "matte." The most extensive impurities in matte are iron and sulfur. The iron is removed in step (c) by the formation of an iron silicate slag which is poured from the mouth of a converter vessel. Copper sulphide is then the chief product remaining in the converter vessel (copper sulphide is also known as white metal.). After the white metal stage is reached, air continues to be

blown into the copper sulphide. The sulfur unites with the oxygen in the air, forming sulphur dioxide, which escapes as a gas. Copper is then the remaining product in the converter vessel.

Formation of the iron silicate slag is a heat-liberating reaction; it therefore raises the temperature of the bath and provides enough heat for the copper-forming stage. Although the copper-forming stage is also a heat-liberating reaction, the amount liberated is considerably less than in the slagging period.

"Poling" (step (d)) is a process for removing oxygen left in the copper. It consists of inserting fresh-cut wood poles into the molten copper. The wood disintegrates, forming gases which unite with oxygen and pass off. In recent years specially-constituted gases have been used in lieu of poling.

## 20.

The bulk of American copper smelting in recent years has been done upon low-grade ores consisting of two per cent copper or less. The profitability of a smelter therefore is largely dependent upon the efficiency by which it eliminates the waste materials connected with copper.

## 21.

The procedure of smelting followed at San Manuel is generally representative of the way it is done at other large smelters in this country. The ore is first selectively mined. It is then sent to a mill where it is crushed and a waste material (known as gangue) is separated from the copper-bearing materials. The product of the mill (concentrate) is then sent to the smelter where it is treated in a reverberatory furnace to remove impurities chemically associated with copper, primarily iron and sulfur.

A reverberatory furnace is a long rectangular box in which the charge lies in a shallow hearth. It is heated by a flame passing over the surface of the charge, and the roof is constructed so that heat will also radiate from the top. A modern reverberatory furnace is capable of processing between 700 and 2,000 tons of concentrate each day.

For the last half century it has been the custom to produce in the reverberatory furnace a matte consisting principally of a mixture of copper and iron sulfide, charge the matte into a Bessemer-type converting vessel, blow air through the converter to produce partly refined copper, then purify the partly refined copper in some kind of refining furnace. The refining furnace used is commonly referred to as an anode furnace because the next step is the final purification by electrolytic refining; the copper from the anode furnace becomes the anode in electrolytic refining.

## 22.

The patent in suit is not concerned with the source of copper, nor with the method of producing copper matte; it is concerned with the quality of the product after it has been through the converting process.

Converting is the process of blowing thin streams of air through the molten matte in a refractory lined converter. The converting process for smelting copper mattes was derived from a process developed in the steel industry known as "Bessemerizing." This process was first used by Sir Henry Bessemer to refine pig iron; but it was not at first successful in copper smelting until the tuyeres (air ports) were placed at the side of the converter instead of the bottom. This was accomplished in 1880 by Pierre Manhes of France.

Further developments of converters were improvements in equipment, in the size and shape of converters and in the durability of the refractory lining. The early converters patterned after the Bessemer converter were acid lined with silica or siliceous ore. Thus, the lining served both as a refractory to protect the converter shell and as a flux for the oxidized iron. This resulted in rapid corrosion of the lining so that the converter shell had to be relined every four to six blows.

Development of the basic lined converter was the next step. The slow and wasteful method of using the converter lining for flux left much to be desired, and it was necessary to find a refractory lining which resisted the action of the basic FeO so that relining would not be so frequently required. Use of a basic lining would, however, require additions of siliceous flux to slag the iron oxide. Successful use of a basic lining was accomplished in 1910 at the Garfield Smelter. The operation was conducted in a Pierce-Smith horizontal converter lined with magnesite brick and using silica flux.

The superiority of this over the acid lining was obvious and it was soon adopted by other smelters. Today the basic lined converter is standard and practically all converter linings are made of magnesia—either magnesite brick or a monolithic lining tamped in position.

### 23.

The Pierce-Smith converter used in the Garfield experiment was itself an advancement in the converting art. Previous converters utilizing the Bessemer process had been upright or vase-shaped; the Pierce-Smith inaugurated a new style in the form of a horizontal barrel. The Pierce-Smith has a mouth on the side for charging and discharging materials, and it can be rotated 360 degrees on its horizontal axis. They were small at first, but have grown in size so that the modern barrel-type converter can hold a hundred tons or more of molten metal.

Along the horizontal axis of the Pierce-Smith converter is a manifold for introducing air into the molten bath within the converter. This is known as the tuyere line. It is located so that when the mouth of the converter is rotated upward into a vent-hood (stack) the tuyere line is submerged below the level of the molten bath in the converter. When the tuyeres are submerged they are said to be in blowing position. Conversely, when the mouth is rotated downwards toward pouring position ("out of the stack") the tuyeres will be lifted out of the molten bath.

### 24.

For approximately the last fifty years the most commonly-used converter in the copper industry has been and still is the barrel-type, usually referred to as a Pierce-Smith converter. The defendants from the beginning of operations at San Manuel has used the Pierce-Smith type converter with a capacity of approximately 100 tons of metal. The converters at San Manuel are equipped with a conveyor system for introducing silica flux while the converter is in the stack, which is in the air-blowing position.

### 25.

Converters have generally been operated by men who, through several years of experience and close observation, have developed special ability in the art of producing copper. These convertermen have utilized such signs as the subtle colorations of the flame, the size, color, shape or quantity of sparks issuing from the converter and the color and texture of the liquid and solid samples to determine when certain steps should be taken. The acquisition of these skills is apparently not available through formal academic training; they must be learned from apprenticeship as a converter operator.

### 26.

The Redmond Patent concerns operations conducted in the converter during the finish period of converter operation. Until the appearance of the Redmond Patent, the copper industry had generally adopted three processes for finishing copper: the blister process, the overblowing process, and the third vessel process.

Converters have generally been operated to produce copper in the high blister range; however, the overblowing process will produce flat or peahole copper.

The blister process is and has been the more common process. With this method copper is refined in the converter to the

blister stage; the refining process is then completed by transferring the copper to a finishing furnace where it is again air blown but at a diminished rate and for a longer period of time; three to five hours being the usual range for a charge of 250 tons. After the oxidation treatment the copper is poled to reduce oxygen content.

If the overblowing process is used, up to several per cent of the copper will be oxidized during the air blowing-oxidizing procedure; this produces copper oxide which appears as a separate phase floating on the top of the bath. If granulated slag is present, experience has shown that a supernatant liquid slag will be produced, commonly called an oxide slag. The practice has been to pour off this layer of oxide slag and transfer it to another converter where the oxidizing process is not so far advanced.

Producing peahole copper by the overblowing process has disadvantages. It must be carried out at high temperatures —2300–2600° F. And at these temperatures the oxide slag produced is particularly corrosive to the basic converter linings. Furthermore, the oxide slag is a potentially explosive mixture and must be handled with great care in transferring it to other converters. This means slower movements with a consequent decrease in operating efficiency.

With the oxide slag removed, the copper is then transferred to a finishing furnace for poling. If the granulated slag is completely removed before overblowing begins, the entire contents of the converter, including the separate phase copper oxide, is transferred to the finishing furnace for poling. Usually, overblown copper requires only a minimal amount of blowing in the finishing furnace.

### 27.

The third vessel process was developed to strike a compromise between the prolonged piping time of the blister process and the high equipment wear and safety hazards inherent in the overblowing process. With the third vessel process

(also referred to as the "holding and oxidizing" process) the copper is removed from the converter at the clear copper stage and charged to an oxidizing furnace. The oxidizing furnace is gas fired to retain the heat of the charge, and is equipped with a smaller number of tuyeres than a converter. Air is blown through the tuyeres until about five per cent of the copper is converted to copper oxide and nearly all of the sulfur is removed by oxidation. The oxidized copper is then transferred to a finishing and casting furnace for poling and casting.

### 28.

Converter operation falls generally into two stages: the slagging stage and the finish stage.

In the slagging stage, air is blown through the tuyeres of the converter and into a charge of matte. With a basic-lined converter, silica flux is usually added shortly after the blow begins. The penetrating stream of air oxidized the matte (which is an iron-copper-sulfide compound) by preferentially reacting the iron sulfide (FeS) to form sulfur dioxide ($SO_2$) and iron oxide (FeO). The sulfur dioxide ($SO_2$) is a gas which passes into the atmosphere. The iron oxide, however, reacts with the silica ($SiO_2$) and forms iron silicate, which is a liquid. This liquid is lighter than the remaining contents of the converter and floats on top. At intervals this liquid silicate, known as slag, is poured or skimmed off into a ladle, leaving nearly pure copper sulfide (white metal) behind.

When silica-lined converters were used, part of the lining was consumed in forming the iron-silicate slag; with the basic-lined converter, silica is added to the converter as it is needed to form the iron silicate. Addition may be accomplished through the mouth of the converter either by a traveling crane or by a fixed conveyor belt. "Garr guns" which blow streams of silica in through one end of the converter have also been used.

As the converter is successively slagged, new charges of matte are poured in.

This slagging and recharging is continued until a full charge (70–110 tons) of white metal is built up in the converter. The converter is then nearly ready to "go on finish." Just prior to putting the converter on finish, however, the operator usually removes as much slag and silica as possible. This cleanup is done to prevent the possibility of foaming during the finish period.

This slag consists primarily of iron silicate. However, it may contain other impurities as well, and possibly some copper. For this reason it is normally charged back into the reverberatory furnace where matte is produced.

### 29.

Converting from white metal to the various stages of copper is the second stage or the finishing process. However, before commencing the finish blow the converter operator takes measures to control the temperature of the bath since the temperature on finish should be lower than during the slagging period. He has two principal means of temperature control: by addition of cold materials and by controlling the depth of the tuyeres. The cold materials (also referred to as ladle chips) are usually the metal that has frozen to the side of the ladle as matte copper as it was being transported. This copper is knocked from the ladle and used for temperature control. Since it is already converted copper its addition to the bath will not chemically reverse the converting process.

In addition to using ladle chips (also known as ladle skulls, cold reverts, cold dope) the operator can manipulate the tuyeres to control temperature. If he sets them just below the level of the bath ("blows light") the air from the tuyeres will have a tendency to cool the bath. If the tuyeres are set substantially below the level of the bath ("set heavy") the bath has a tendency to warm up.

### 30.

During the finishing period the converter operator continues to blow air into the bath, which at the beginning of the finish blow consists principally of copper sulfide ($Cu_2S$). The chemical reaction between the copper sulfide and air forms metallic copper and sulfur dioxide ($SO_2$).

The sulfur dioxide is a gas and passes off into the atmosphere.

As metallic copper is formed it moves to a separate layer below the white metal. The common practice is to continue blowing until the white metal disappears as a separate phase so that the only remaining substances are metallic copper and a small percentage of impurities.

The disappearance of copper sulfide as an observable separate phase is coincident with what is called "regal" copper. From "regal", which occupies what might be called the lowest rung in the ladder of copper stages, copper will eventually be processed through the following stages: clear copper, low blister, medium blister, high blister, worm coming on, full worm, worm going off, flat, and peahole copper. Each of these words is a term of art. Each represents a stage where the amount of metallic copper present is greater than the next previous stage. The words themselves were coined by observing the surface appearance of a small sample (sometimes referred to as a "say sample") taken from the converter and allowing it to cool. A skilled converter operator can also tell the various stages of copper by observing the subtle variations in the colors of the flames and sparks as they issue from the mouth of the converter.

### 31.

As white metal is oxidized to metallic copper and sulfur dioxide there is no appreciable formation of copper oxide as such because the copper oxide is reduced to metallic copper as fast as it is formed. After the white metal, or copper sulfide, has disappeared as a separate phase and the sulfur present is dissolved in the liquid copper, further oxidation and removal of sulfur as $SO_2$ causes oxygen to be introduced; and as the sulfur content of the liquid decreases the oxygen content increases. As the sulfur begins to

reach a very low value, the excess of oxygen appears as copper oxide, which is a separate liquid phase that floats on top of the copper bath.

### 32.

After completing the finish period in the converter the copper is transferred to another vessel, called an "anode furnace" or a "fire refining furnace." In these furnaces the copper is further oxidized and more sulfur in the form of gaseous ($SO_2$) is removed. The oxidation in these furnaces is accomplished by blowing air through small iron pipes or lances at a much lower volumetric rate than in the converter. This additional piping of air continues until the copper has become saturated with copper oxide ($Cu_2O$); the sulfur level is then at an acceptable commercial level.

Up until this point oxygen has been deliberately introduced in the converting and refining processes as a chemical reagent. Its purpose was the removal of sulfur. However, its continued presence would constitute another impurity, and it is therefore removed from the copper by a process known as "poling."

After processing at the anode furnace the copper is cast into the desired shape for further processing by electrolytic refining.

## REDMOND PROCESS

### 33.

Eugene Redmond himself conceived his particular approach to converting, which resulted in a patent, after discussion with his brother, observation, and various experiments.

At the time he began his experiments, no method was known for quickly removing the last traces of sulfur and other impurities. Moreover, no method was known for removing impurities quickly without forming substantial amounts of copper oxide (oxide slag). The only known method of copper purification and refining was by oxidation; and using this method there were only two general methods of converter operation available: the blister process where the copper was removed from the converter at an early stage (before copper oxide is formed as a separate phase) and the refining completed in a fire-refining furnace, or the overblowing process which produced an oxide slag with its attendant disadvantages. Neither the blister process nor the overblowing process was completely satisfactory to the industry and before the Redmond Patent the industry solution was to attempt to control the conditions in a way that would minimize the disadvantages of the course taken. One solution was by using a separate oxidizing furnace which would process the copper before it was transferred to the fire-refining furnace. This method was not used by the defendant, San Manuel, nor is there evidence of any widespread use by the industry.

### 34.

The patent in suit (Redmond Patent No. 2,895,821) is a process for refining copper in the converter. It does not have the disadvantages of either the blister process (prolonged piping time in a fire-refining furnace) or the overblowing process (high lining wear, dangerous oxide slag). The Redmond process produces in the converter, copper that is almost fully refined; it may require little or no further refining in the fire-refining furnace but it does require poling to reduce the oxygen content, as does copper produced either by the blister or overblowing processes.

### 35.

In the Redmond process oxidation in the converter is carried out in the usual manner by blowing air through the tuyeres; but the blow is continued beyond the blister stage and up to and through the worm stage. This requires only a few minutes in a converter holding 75 to 100 tons of blister copper. The temperature of the bath is kept between 2050° F. and 2250° F., usually 2150° F. to 2200° F. for the blow during the post-blister stage and the temperature may be reduced as the blow progresses. Silica flux is added to the bath as the worm stage is about to disappear. The

amount of silica flux should be from two to five percent of the weight of copper and it is added while the blow continues. The silica mixes with the granulated slag atop the bath and forms a dense coating which appears solid to the eye. This coating absorbs substantial proportions of sulfur and some other impurities in a few minutes' time. The amount of blowing time required depends on the size of the charge, the blowing rate, and the degree of accuracy in determining when to add the flux.

If about 75–80 tons of copper are in the converter about 2.5 tons of silica flux are recommended; if the flux is added just as the worm is about to disappear a blowing time of about five minutes is required to produce a highly-refined copper. It is an important feature in order to obtain the greatest efficiency of the invention that the silica flux be added just as the worm is beginning to disappear; and the silica should be present in substantially solid form to perform its function of impurity absorption. The copper is then poured out from under the solid coating and transferred for any further refining that may be necessary, such as poling and casting and electrolytic refining.

Based upon the testimony of Professor Butts and his interpretation of Dr. Dean's testimony in the Kennecott case, there is evidence to show that two immiscible liquids are formed from molten copper sulfide at the temperatures and under the conditions of the Redmond process; that one of these liquids is relatively high in sulfur content and the other liquid contains very little sulfur; that the liquid rich in sulfur—being uppermost—is absorbed by the silica coating and the sulfur is thus removed very rapidly because of this absorption. The Redmond process relies on a mechanism distinctly different from oxidation.

### 36.

The silica flux applied in the Redmond process is not to be confused with other forms of slag coatings. When a converter is blown to the blister copper

stage and beyond, a slag known as granulated slag usually forms. This is a product in the form of discrete balls, usually containing a nucleus of silica but comprising mostly magnetite. Granulated slag does not have the chemical or functional characteristics of the Redmond coating containing silica flux and such granulated slag as might be present when the silica flux is added. The Redmond coating is also entirely different from so-called oxide slag, which is a liquid mixture of granulated slag and copper oxide. The use of a dam at the mouth of the converter to hold back the slag when the copper is poured from the converter also differs entirely from a functional standpoint from the Redmond coating. There is no evidence that any slag formed in the converter or any other vessel in accordance with any prior art process has the same function and result as the silica flux coating employed in accordance with the Redmond Patent.

### 37.

In the patent specifications the sulfur dissolved in the partially refined or blister copper is stated to be "free sulfur." If "free" means uncombined with any other element, the court accepts this definition. However, the court cannot find that elemental, uncharged sulfur exists during the Redmond process. Professor Butts testified that the word "free" also includes the sulfur ion, and I do find that ionic sulfur can exist under the conditions of the Redmond process. Professor Butts (who wrote the definition of chemically "free" for the Webster's International Dictionary) and Professor Kellogg both testified that it was likely that the sulfur ion could be present in liquid copper.

### PERTINENT PRIOR ART, PATENTS AND PUBLICATIONS

### 38.

Defendants rely principally on four prior patents and two publications in support of their contention that the invention described and claimed in the

Redmond Patent would have been "obvious" at the time the invention was made to an ordinarily skilled worker in the art. These are:

| Document | Alleged Effective Date |
|---|---|
| 1. Mitchell Patent 705,109 | 1902 |
| 2. Herreshoff Patent 1,103,925 | 1914 |
| 3. Smith Patent 943,280 | 1909 |
| 4. Nielsen Patent (British) | 1935 |
| 5. Archibald Article, Jour. Metals | 1954 |
| 6. Instructions to Pierce-Smith Licensees | 1924 |

## MITCHELL PATENT

### 39.

The Mitchell Patent, No. 705,109, was issued over sixty years ago, and there is no evidence that it has gone into general use.

At the time Mitchell patented his process he was faced with the problem of conserving heat. His process was intended for use in the barrel-type converter, and the barrel-type converter of that vintage was lined with silica. Mitchell did not add silica, as Redmond does. Moreover, there is nothing in the Mitchell patent which suggests the silica lining of a barrel would form a coating and perform the function of the Redmond patent. And there is nothing in the Mitchell patent which suggests the addition of silica.

The Mitchell patent was also operating on a significantly different type of charge than the Redmond patent does. The Redmond patent operates on low-grade mattes, approximately thirty per cent copper. The Mitchell patent, however, was designed for use on mattes of forty to sixty per cent copper. Defendants' expert witness, Charles R. Kuzell, testified on cross examination that it would be impractical to use an acid-lined converter, such as Mitchell describes, in modern copper smelting; metallurgical economics forbid it.

The Mitchell process is essentially an overblowing process. If it were to be used as a substitute for the Redmond process it would produce an oxide slag, which Redmond does not.

For these reasons I find that the Mitchell Patent No. 705,109 as prior art fails to disclose the steps of the Redmond process. Nor is there anything in Mitchell, when combined with other prior art cited by the defendants, which would suggest either the overall result of Redmond or the steps of Redmond to one skilled in the art.

## HERRESHOFF PATENT

### 40.

The Herreshoff Patent (No. 1,103,-925) issued July 14, 1914, was chiefly concerned with the same problem as Mitchell: heat conservation. He was apparently smelting high-grade (sixty per cent and over) mattes in small, high surface-to-volume converters.

As stated by the Herreshoff Patent, his invention consists of "introducing silicious material into a converter upon the molten charge therein, which material thus becomes heated but chemically remains unchanged, removing the charge from said material and utilizing said heated material as a fluxing medium for a subsequent charge of matte."

He gave two examples of use—one using an excess of silicious material during the iron-forming stage, and the other by placing the silicious material on top of the blister copper "immediately before the copper is poured," to extract heat from the copper for use with another

charge. In either example, the copper material (whether white metal or blister copper) is poured out from under the silicious material; but the silicious material remains inert; it is heated by the bath but otherwise unaffected.

There is nothing in the Herreshoff patent which indicates that the copper is blown further after adding the silicious material. There is nothing in the Herreshoff patent to indicate that it produces peahole copper, as Redmond does. There is nothing in the Herreshoff patent to indicate that his introduction of silicious material is intended to or does remove impurities at the blister or higher stages of copper, as Redmond does.

Finally, there is no evidence that the Herreshoff patented process ever went into actual commercial use.

I find, therefore, that the Herreshoff patent, as prior art, fails to indicate the steps of the Redmond process. Nor is there anything in Herreshoff, when combined with other prior art cited by the defendants, which suggests either the overall result of Redmond or the steps of Redmond to one skilled in the art.

## SMITH PATENT AND INSTRUCTIONS TO SMITH LICENSEES

41.

The Smith Patent, No. 943,280, issued December 14, 1909, essentially describes the blister process. The Redmond patent goes beyond the blister process. The slag described by Smith is not of the same consistency or chemical quality as the impurity-removing slag or cover of Redmond. Furthermore, the Smith patent cautions against having silica in the converter during the finish period. This is directly opposite to the teaching of Redmond.

■ There has been some contention as to whether the Instructions to the Pierce-Smith Licensees are a publication within the meaning of 35 U.S.C. § 102. They are a part of the records of the United States Court of Appeals for the Third Circuit. Those of the public who have an interest in them may easily obtain a copy. I find that this satisfies the requirement of a "publication."

The Smith Instructions, however, would not indicate to one skilled in the art how to achieve the result that Redmond does. The Smith Instructions do counsel adding silica, as does Redmond, but the Smith addition comes before the charge is all metallic (i. e., when one to two per cent iron is still in the converter). This addition is at a different phase, and the timing is an important factor in achieving the Redmond results. Secondly, the slag produced by the Smith Instructions is different in character and function from that of Redmond. The Redmond slag has a "solid" appearance and achieves a sulfur removal; the Smith slag is liquid or a thin paste and its function is to trap iron. Finally, adherence to the Smith Instructions will not produce peahole copper. The result, at best, is a medium blister.

The Smith Instructions fail to indicate the steps of the Redmond process. Nor is there anything in the Smith Instructions, when combined with other prior art cited by the defendants, which suggests either the overall result of Redmond or the steps of Redmond to one skilled in the art.

## NIELSEN PATENT

42.

The Nielsen Patent (British No. 472,-626) was fully considered by the patent office. The granting of the Redmond patent with full knowledge of the Nielsen patent creates a presumption that the Redmond invention is not obvious from Nielsen.

The slag described by Nielsen in his process is always liquid, not "solid" as described in Redmond. Nielsen also prescribed an excess of free silica at every stage of the converting operation. If one attempted to make peahole copper by using the Nielsen process the combination of liquid slag and excess silica would cause the converter to foam. Besides the danger to personnel, this foaming

would make the Nielsen process impractical for producing peahole copper. The evidence does not overcome the presumption stated above.

## THE ARCHIBALD ARTICLE

### 43.

Redmond had reduced his invention to practice by May of 1952 at the Kennecott smelter, Hurley, New Mexico. He continued experimenting to further perfect his process and during a two-week period in October or November of 1953 he was able to finish several charges in a row of peahole copper. The publication date of the Archibald Article is March, 1954. The article therefore does not appear to be a valid prior art reference. However, assuming for argument's sake that it would be a valid prior art reference the mechanism and results of the process described by Archibald are different from Redmond's invention. The testimony on this point is decidedly in conflict. Dr. Dean's testimony in the Kennecott case, as interpreted by plaintiffs' expert witness, Professor Butts, indicated that the silica coating absorbed the sulfur. Judge Walsh found that the sulfur was removed "by a new physical-chemical process, and not by mere oxidation." Professor Butts, testifying in the present case, fully subscribed to the absorption theory of Dr. Dean. Professor Kellogg, the defendants' expert, on the other hand, testified he knew of no mechanism that would absorb sulfur under the conditions in the converter. I believe that the preponderance rides with the absorption theory and therefore find the sulfur-removing mechanism to be one of absorption. The Archibald mechanism is one of oxidation, so it is clear that the Redmond process is not described by the Archibald article in this respect.

Secondly, the Archibald article describes a process that is essentially an overblowing process; as a consequence an oxide slag is formed. This is not so with the Redmond process. It produces no oxide slag, which is an undesirable product, and the Redmond process is advantageous for this reason, among others.

## OTHER PRIOR ART

### 44.

No other prior art patent or publication cited by the defendants reveals or indicates:

(1) a process which produces peahole copper in the converter without also producing an oxide slag;

(2) a process which includes the steps of blowing the copper mass in the converter past the blister stage, adding silica flux while continuing the air blow, blowing until the silica flux solidifies and absorbs sulfur and other impurities from the copper, and then pouring the resulting refined copper out from under the solidified coating;

(3) a process whereby copper is processed in the converter through the blister stage and to a late worm stage, the temperature controlled to between 2050° F. and 2250° F., a substantial amount of silica flux added to the converter while blowing is continued until the silica flux forms a solid coating with the granulated slag and impurities in the copper are absorbed thereby, and the resulting product—a highly refined copper comparable to that obtained by fire refining—is poured out from under the coating;

(4) a process in which copper is refined in the converter to and through the worm stage, including the steps of maintaining the copper mass at a temperature between 2050° F. and 2250° F., adding silica flux when the sparks from the converter have the appearance of breaking or bursting, continuing the air blow until the gaseous flames from the molten mass are substantially transparent, then drawing off the refined copper from underneath the solid coating which forms;

(5) a process whereby copper is processed in the converter through the blister stage and to a late worm stage, temperature controlled between 2050° F. and 2250° F., a substantial amount of silica flux added to the converter while blowing is continued until the silica flux forms a solid coating with the granulated slag, and impurities in the copper are absorbed in the coating.

The Redmond patent, however, does disclose all the steps and results summarized above.

### 45.

No group of patents or publications of the prior art shows a process which is functionally equivalent to the patent in suit. All of the prior art patents and publications utilize purification procedures based upon the direct oxidation of sulfur and other impurities with oxygen brought into contact with the molten copper mass by blowing air through it. The patent in suit accomplishes the final purification in the converter by absorbing the impurities within a coating of silica flux by introducing the flux just as the worm is about to disappear.

It would not be obvious to combine various steps from prior art publications to accomplish the patented process. Considering all the contents of the prior art publications, no combination of any of the steps of the cited publications would accomplish the function and results of the patent in suit.

## OTHER DEFENSES RE VALIDITY

### 46.

In addition to relying upon prior art, defendants attack the validity of the Redmond Patent on the same grounds that the defendants did in the Kennecott case: (1) it was not Redmond who discovered the process in question; (2) new matter was added during the prosecution of the patent; and (3) the patent is ambiguous and lacking in meaning to one skilled in the art.

### 47.

The alleged admission by Redmond's attorney, Royall, that the invention Redmond sought to patent had originated in Belgium is overcome by the weight of evidence. The letter does not identify what part of the disclosure originated in Belgium nor is there a specific statement in the letter that the invention is that of someone other than Redmond.

Furthermore, Redmond testified that he had experimented extensively during the time he was employed by Kennecott Copper at Hurley, New Mexico. Eugene Redmond also testified that his brother told him he had seen a blackish coloration on a silica dam at the mouth of a converter. The dam was used to hold back slag at the mouth as the copper was poured. The blackish color suggested to Howard Redmond that the silica had picked up something from the copper. As indicated by the Offerhaus article, offered as to prior art, copper itself sometimes shows a blackish color. This blackish color could well have been copper at a particular stage of purification. However, nothing in Howard Redmond's disclosure indicates the discoloration was caused by sulfur. The foregoing references, along with other evidence, establish that Eugene Redmond—and he alone —conceived the patented process and reduced it to practice while at the Hurley plant.

Defendants have failed to carry their burden of showing that the invention originated elsewhere than with the patentee.

### 48.

The original patent application made nine claims and was filed by Eugene R. Redmond through his Washington patent attorneys, Parker and Walsh, on May 18, 1954. After an earlier rejection, an examiner on October 4, 1957 again rejected all claims as unpatentable over Nielsen. Parker and Walsh thereafter had discussions with the examiner and on March 24, 1958 proposed minor but clarifying amendments to claims 1 to 4 and cancelled claims 5, 6 and 7. On April 4,

1958 an examiner considered the amendments and found they were not convincing and should not be entered. If an appeal were to be taken, however, the examiner would enter the amendments to narrow the issues and place the case in better condition on appeal. Thus, on April 29, 1958, the rejection of October 4, 1957 was withdrawn, the amendments of March 24, 1958 were noted and a final rejection of the amended claims 1, 2, 3, 4, 8, and 9 and cancellation of claims 5, 6 and 7 was entered. In taking such action the examiner stated:

"Such action is taken in view of applicant's complaint that he has been unduly prejudiced by the delay in filing the Office letter responsive to applicant's amendment under Rule 116. Also the possibility of said Final Rejection being premature is recognized in the light of the facts that the four Office actions, thus far, were handled by as many different Examiners, that the rejection made in the Office action filed February 6, 1957 was ambiguous, and that the patentee's name on the reference cited in the latter Office action was incorrect.

"Claims 1 through 4, 8 and 9 remain rejected as unpatentable over Nielsen, of record, for reasons stated in Office actions filed February 6, 1957, October 4, 1957 and April 4, 1958, respectively."

On October 13, 1958 Redmond assigned the application to Brian Jackson Associates, Inc. and on October 15, 1958 Max E. Shirk of Tucson, Arizona was appointed its attorney and substituted for Parker and Walsh. On October 21, 1958 Shirk filed a notice of appeal to the Board of Appeals.

On December 17, 1958, in response to the final rejection on April 29, 1958, the attorney for the assignee filed proposed amendments to the original application of 1954, including an amendment to page 5 of ten pages of specifications which changed the words "completely oxidized" to "free of impurities" in a phrase prescribing the continuance of blowing in the converter after the silica flux is add-ed "until the copper is substantially *completely oxidized*"; amending claims 1 and 2, as may be noted on pages 43 and 44 of the file wrapper DX 21; and cancelling claims 3, 8 and 9. The proposed amendments were followed by several pages of remarks explaining and supporting the amendments and distinguishing the Redmond Process from that taught under the cited Nielsen British Patent. On December 17, 1958, Mr. Shirk also filed a brief, appearing in the file wrapper at page 49, which called attention to the proposed amendments setting forth the three claims sought thereunder, and argued for reversal of the examiner's rejection. With the proposed amendment and the brief on appeal submitted and pending before the Patent Office, Notice of Allowance of the Application for Patent, by direction of the Commissioner, was mailed on February 3, 1959 to Max E. Shirk, Tucson, Arizona. On March 2, 1959 (filed March 12, 1959) Mr. Shirk submitted proposed amendments as follows:

"The Commissioner of Patents
Washington 25, D. C.

"Sir:

"Applicant respectfully requests that the above-entitled application be amended under the provisions of Rule 312 as follows:

"Page 7, Lines 2 and 3, change 'completely oxidized' to: *free of impurities.*

"Page 7, Line 21, change 'completely oxidized' to: *substantially free of impurities.*

"Page 10, Line 9, change 'about 99.-5 percent' to: *98 percent or more.*

"REMARKS

"In reviewing the application before allowing it to go to issue, applicant found that the contradictory statement which was corrected on Page 5 by a previous amendment also appeared at Page 7.

"The percentage of copper in the definition of blister copper has been changed to conform to the commonly

accepted definition found in most text-books, such as Metallurgy of Copper by Newton and Wilson, 1942 edition, Page 178, published by John Wiley and Sons, Inc., New York.

"Applicant respectfully submits that the above amendment does not contain new matter and requests that it be entered under the provisions of Rule 312.

"Respectfully submitted,
EUGENE R. REDMOND
By MAX E. SHIRK."

### 49.

A careful examination of the proceedings before the Patent Office, particularly the action outlined in the preceding finding (48), together with a fair reading and reasonable interpretation of the language of the original application filed by Mr. Redmond in 1954; the language of the proposed amendments, considered in light of the explanation of Mr. Shirk; the reasons assigned by the examiner in rejecting the claims originally; and the final action allowing the application; clearly support a finding that

(a) an authorized examiner concluded that the application as amended should be allowed without need of further consideration by the Board of Appeals;

(b) the examiner fully considered the original application, together with the amendments, and concluded that the proposed amendments did not introduce matter undisclosed either by the substance of the specifications and claims or inherent in the process referred to therein;

(c) the question of new matter was specifically raised before the Patent Office by Mr. Shirk in the amendments proposed after notice of allowance but before issuance, and was fully considered and resolved in favor of applicant;

(d) the patent examiner at no time requested that a supplemental oath be filed and no supplemental oath was necessary.

### 50.

The evidence is insufficient to sustain a finding that new matter was introduced into the disclosure of the invention by the amendments proposed by Mr. Shirk as attorney for the applicant, Redmond, and his assignee.

### 51.

The application for patent as filed by Redmond in 1954 disclosed the invention covered in it three claims as allowed. The amendments of the specifications and/or claims did not introduce matter which to one skilled in the art was not disclosed in the words of the specifications and/or claims as filed or understood by one skilled in the art as inherent in the process as disclosed in said specifications and/or claims.

### 52.

The Redmond Patent in suit is not ambiguous or lacking in meaning to those skilled in the art but on the contrary, as may be inferred from the testimony of the several skimmers called as witnesses and found from the expert testimony of Professor Butts, teaches those skilled in the art the manner in which the process covered by the claims of the invention is practiced.

### 53.

■ The defendants have failed to sustain their burden of proving their affirmative contentions with respect to the invalidity of the three claims of the patent in suit No. 2,895,821, as set forth in their contentions 100 through 130, section IV of the pretrial order.

## INFRINGEMENT

### 54.

The evidence shows that the defendants operate the converters at the San Manuel Smelter generally in the following manner:

(a) a molten mass of blister copper is refined through the worm stage;

(b) a substantial quantity (approximately 3 tons) of silica flux is added to the molten mass at a late stage in the finish period. This flux is the same type as that used during the slagging period and which would be used for the production of blister copper;

(c) at least part of the time the silica flux is added at the worm-about-to-disappear stage of the process;

(d) the air blow is continued after the flux addition, the silica remaining solid;

(e) the silica and granulated slag form a solid coating or blanket over the molten mass until the flames become transparent; and

(f) the molten mass is poured from beneath the coating in the converter.

This is substantially the process described by the Redmond patent.

### 55.

After the issuance of the Redmond Patent, Eugene R. Redmond, with the knowledge and at least tacit approval of his superiors, personally operated converters at the San Manuel Smelter substantially in accordance with the disclosure and claims of the Redmond Patent. Furthermore, Redmond supervised the operation of the San Manuel converters by the skimmers on his shift, also substantially in accordance with the disclosure and claims of the Redmond Patent.

### 56.

Defendants' usual converter practice produces flat or peahole copper. When copper lower than flat copper is produced, it is because of a mistake or error on the part of workmen and not by design or intent.

### 57.

It is a reasonable inference from the evidence—particularly the testimony of Eugene Redmond, plaintiffs' exhibit numbered 84 and those similar to it, and the testimony of John T. Cullom—and the court finds:

(a) that blister copper is usually refined to and through the worm stage at a temperature of between about 2050° F. and 2250° F. and usually not in excess of about 2150° F. as substantially described in the Redmond Patent and within the scope of the claims thereof;

(b) that the silica flux is usually added in defendants' general process at the "worm-going-off" or "worm-about-to-disappear" stage as specifically described in the Redmond Patent and within the scope of the claims thereof;

(c) that in those instances where silica flux is added in two increments in defendants' general process, the first increment usually is added in the late blister stage and the second increment is usually added at about the "worm-going-off" or "worm-about-to-disappear" stage, substantially as described in the Redmond Patent and within the scope of the claims thereof;

(d) that during the further blowing in defendants' general process, the silica flux added during the late finish period forms a solid coating with the granulated slag, substantially as described in the Redmond Patent and within the scope of the claims thereof;

(e) that in defendants' San Manuel Smelter, it is the usual practice to continue the air blow during and after the flux addition until the charge is finished, at which time the flames are almost completely transparent, substantially as described in the Redmond Patent and within the scope of the claims thereof.

### 58.

Defendants' general practice as set forth in findings 54, 56 and 57 originated prior to the issuance of the Red-

mond Patent and has continued without substantial change to the date of trial and presumably until the present time.

### 59.

In order to obtain the new function and advantages of the Redmond Process it is not necessary that the silica flux be added exactly at the worm-going-off stage of the copper refining process, although this is the optimum and preferred time to make the flux addition. The Redmond Patent indicates to one skilled in the art that some leeway in the exact point of addition of flux is permissible.

### 60.

The fact that defendants produce flat or peahole copper is not, by itself, sufficient evidence that the defendants are using the Redmond Process. However, this may be considered along with other evidence to determine the presence of infringing acts.

### 61.

Claims 1 and 3 of the Redmond Patent (United States No. 2,895,821) have been infringed within the last six years by operations carried out in the converters at defendants' San Manuel Smelter.

### 62.

Accompanying these findings of fact and conclusions of law is a memorandum providing some background and comment in support of the court's findings and decision herein. Insofar as the memorandum may contain any findings of fact they may be considered as supplemental to the findings of fact herein.

From the foregoing findings of fact the court makes the following

## CONCLUSIONS OF LAW

### 1.

Jurisdiction is vested in this court by virtue of Title 35 U.S.C. §§ 271, 282–285; Title 28 U.S.C. § 1400; and Title 28 U.S.C. § 1338(a), this being an action for alleged patent infringement of United States Patent No. 2,895,821.

### 2.

Plaintiff, Brian Jackson Associates, Inc., is the owner of United States Letters Patent No. 2,895,821, the Redmond Patent, issued July 21, 1959; since March 21, 1964, plaintiff Buros has been exclusive licensee under the Redmond Patent.

### 3.

Plaintiffs' Redmond Patent No. 2,895,-821 was duly and lawfully issued by the United States Patent Office and is presumed to be valid and the burden of proving invalidity rests upon the defendants. Defendants have not met their burden of proving invalidity of the Redmond Patent.

### 4.

The presumption of validity of the Redmond Patent in suit is strengthened by the prior findings of validity in this district in Brian Jackson Associates, Inc. v. Kennecott Copper Corporation, Civil No. 119—Globe, wherein Judge James A. Walsh entered findings of validity, holding the Redmond Patent valid in the face of substantially the same defenses and prior art herein relied on by defendants.

### 5.

Each of the claims of the Redmond Patent is good and valid in law.

### 6.

None of the claims of the Redmond Patent is invalid under 35 U.S.C. § 103. No combination of references relied upon by defendants would have made the invention defined by the claims of the Redmond Patent obvious to a person of ordinary skill in the art at the time the invention was made.

### 7.

The claims of the Redmond Patent are valid over the cited prior art because they define a process comprising a new series of steps, yielding a new and unexpected result not disclosed or suggested by the prior art cited by defendants. The difference between the subject matter defined by the claims of the Redmond

Patent and the prior art references cited by defendants are not such that the subject matter of the claims, taken as a whole, would have been obvious at the time the invention was made to a person having ordinary skill in the art.

8.

The Redmond application which matured into the Redmond Patent in suit was sufficient to teach a person skilled in the art how to practice the patented process and the preferred embodiments thereof. The invention defined by the claims of the issued Redmond Patent was sufficiently disclosed in the said Redmond application as originally filed and is not invalid because of the introduction of new matter by amendment during the prosecution of the said Redmond application.

9.

Claims 1 and 3 of the patent in suit are infringed and plaintiffs are entitled to an injunction restraining defendants, their representatives, employees and other consorts from further infringement thereof.

10.

Plaintiffs are entitled to an accounting for damages by reason of defendants' past infringement of the claims of the Redmond Patent in suit.

MEMORANDUM DECISION TO AC-
COMPANY FINDINGS OF FACT
AND CONCLUSIONS OF LAW

This action is a suit for infringement of United States Patent No. 2,895,821 (sometimes referred to as the Redmond Patent). Plaintiff, Brian Jackson Associates, Inc., first brought suit (Civil No. 119—Globe) in 1959 against Kennecott. Copper Corporation (hereafter referred to as Kennecott) and San Manuel Copper Corporation jointly, but on motion the suit against San Manuel was ordered severed, after which the present action (Civil No. 3297—Phoenix) was initiated against San Manuel Copper Corporation and Magma Copper Company (hereafter referred to as San Man-

uel). Changes in the status of the parties occurred after suit was filed but they are not material to the discussion herein; they appear in the findings of fact accompanying this memorandum.

The original suit (Civil No. 119—Globe) was tried before the Honorable James A. Walsh, Chief Judge of the above-entitled court. On the 27th day of April, 1962 findings of fact and conclusions of law were entered; Judge Walsh found the patent valid but not infringed, and thereafter, on the 20th day of June, 1962, an order of dismissal was entered. D.C., 260 F.Supp. 679.

The issues raised in the Kennecott case as to the validity of the Redmond patent were substantially the same as, if not identical to, those presented in the instant case. Counsel for the defendants here, concluding their memorandum in opposition to plaintiffs' motion for consolidation of the cases for trial made April 30, 1960, stated:

"Plaintiff will have every opportunity to fully try the question of validity of the suit patent in the Kennecott case (Civil No. 119 Globe) and also dispose of the issue of infringement by Kennecott at the October 1960 trial without introducing confusion of the practices of San Manuel and Kennecott, respectively. The trial of the San Manuel case will be a relatively simple proceeding after the decision by the Globe Division Court (J. Walsh)."

Mr. Willis H. Taylor, Jr., principal counsel for defendants in this proceeding and likewise lead counsel for Kennecott in the trial before Judge Walsh, stated in the concluding paragraph of his affidavit of May 6, 1960, in opposition to plaintiffs' motion:

"11. The question of infringement of the method claims of the patent in suit is so radically different in each case that confusion of the Court rather than clarity would result if the two actions were 'tried together'."

Having given full consideration to the evidence in this case, and taken judicial notice of the pertinent proceed-

ings in the Kennecott case it is my conclusion that the Redmond patent is in all respects valid and the defendants have infringed claims 1 and 3 of that patent. In deciding the issue of patent validity I have given great weight to the findings of Judge Walsh.[1]

To put my findings of fact in context, some preliminary history of this patent and litigation, in addition to that set forth in the findings, may be helpful. Eugene Redmond, the inventor of the process described by this patent, discovered a method of producing copper of a higher purity than had been previously produced in a converter. The apparent advantage of this discovery is that the rate of production can be increased with corresponding savings in cost.

In the course of this discussion reference will be made to the working vocabulary of the copper industry. Terms such as "blister," "worm-going-off," and "peahole" refer to the various stages of copper finished in a converter. The names were coined from the way the copper

---

[1]. Defendants' answer to plaintiffs' complaint is essentially a verbatim copy of Kennecott's answer in that case. However, in the instant case defendants withdrew their first, seventh and eighth defenses prior to trial, as the pretrial order shows.

Although transcript of the testimony in the Kennecott case has not been filed in this action, much of the record has been admitted into evidence or has been identified by an exhibit number. I do take judicial notice of the record in the Kennecott case.

In the present case plaintiffs have made an argument that the doctrine of res adjudicata should apply since the patent in suit was completely litigated in the Kennecott case; therefore, those findings on validity are binding on this court. The merits of these arguments depend upon the elements of res adjudicata. One of the necessary elements is either privity or identity of parties. Neither privity nor identity exists here. Therefore, the doctrine of res adjudicata is inapplicable.

The question of res adjudicata was specifically brought up in the case of Triplett v. Lowell, 297 U.S. 638, 56 S.Ct. 645, 80 L.Ed. 949 (1936). Another circuit had adjudged certain claims of a patent invalid, and the patentee had filed a subsequent suit for infringement of the same claims. The defendant claimed that suit could not be maintained because of the prior adjudication of invalidity in another circuit. The court said:

"Neither reason nor authority supports the contention that an adjudication adverse to any or all the claims of a patent precludes another suit upon the same claims against a different defendant. While the earlier decisions may by comity be given great weight in a later litigation and thus persuade the court to render a like decree, it is not res adjudicata and may not be pleaded as a defense.

"The court whose jurisdiction is invoked by such a suit must determine for itself validity and ownership of the claims asserted, notwithstanding a prior adjudication of invalidity of some of them, unless those issues have become res adjudicata, by reason of the fact that both suits are between the same parties or their privies." (Id. at 642–645, 56 S.Ct. at 647–649.)

It is clear then that the court must make an independent determination of the patent's validity. This still leaves unanswered the subsidiary question of how much weight the previous findings will receive. The Triplett case speaks of comity. Comity is a conflicts term. It has been defined as a "sense of mutual regard founded on identity of position and similarity of institutions." Re Liebel's Estate, 201 Misc. 1102, 106 N.Y.S.2d 715. It has the power to persuade but not command. Boston Law Book Co. v. Hathorn, 119 Vt. 416, 127 A.2d 120.

Very little of the evidence introduced in the Brian Jackson case had not been presented earlier before Judge Walsh—there were some differences in expert testimony. However, in all material respects, the issues and cited references were the same. Therefore, unless substantial evidence exists to the contrary, which I have been unable to find, the previous findings on validity should stand.

I have made an independent review of the evidence adduced in this case and I have reached the same ultimate conclusion on the issue of validity as Judge Walsh reached.

Where appropriate I have adopted verbatim Judge Walsh's findings of fact; in other instances I have followed but modified pertinent findings; and in addition, I have made new findings of fact. Considered as a whole these findings lead to the conclusion of law that the claims of the patent are valid.

looked in a small spoon or "say sample" which had been taken from the converter. "Blister" copper, for instance, bubbles up and forms a blister in a say sample.

Blister copper is recognizable by the craters formed on the surface of a solidified sample; these may be of varying heights and are correspondingly characterized as "low" or "light" blister, "medium" blister and "high" blister.

Worm copper derives its name from the small amount of molten metal which breaks through the surface of a partially cooled sample and runs over the surface of the sample. Skilled operators recognize stages such as "worm-coming-on," "full worm" and "worm-going-off."

Flat copper takes its name from the essentially flat surface of a solid sample. Flat copper with a small pinhole connecting with a pea-sized cavity under the surface is called "peahole" copper.

Eugene Redmond's experience in the copper industry began in 1924 at the United Verde Copper Company in Clarkdale, Arizona. Except for short interruptions during the depression and World War II, his employment in the copper industry has been continuous. He has worked for four different companies and in five different smelters. During these years he worked his way up from a tuyere puncher and skimmer with United Verde to converter foreman with San Manuel. In fact, it would have been unusual for Eugene Redmond to find employment elsewhere than in copper when one considers that he was raised in the copper country and two of his brothers, Howard and Luther, were also copper men.

Despite his eighth grade education Eugene Redmond apparently has three attributes standard in every inventor worthy of the name: common sense, curiosity, and the ability to observe. These, combined with a comprehensive and practical knowledge of the copper-converting art, are the ingredients of the invention in question. The results are

set forth in United States Patent number 2,895,821.

A combination of circumstances led to Redmond's discovery of the process contained in this patent. Before they can be understood by one unfamiliar with copper smelting and refining, it is necessary to have some idea of the function of the converting operation in the scheme of copper production. Production can be roughly broken up into three categories: ore concentration, converting, and refining. Most of the copper mined in the United States is low grade. It seldom contains more than two per cent copper. The first step in production is therefore to eliminate some of the non-copper materials and thus concentrate the ore. A flotation process is used initially, and the second step is to charge the partly-concentrated ore in a reverberatory furnace which further eliminates unwanted elements by gathering them into a slag that is periodically tapped off. The product of the reverberatory furnace, known as matte, is then sent to a converter.

A converter looks like a huge oil drum turned on its side with a hole cut in the mid-section for loading and discharging. As the name suggests, the converter "converts" the matte to copper by blowing air through it. A fluxing material—sand—is added to the converter along with the matte, and this combination—air, matte and sand—combines chemically to form a gas and a slag. The gas and the slag contain the principal impurities found in copper ores—sulfur and iron. The sulfur passes off as a gas, and the iron, imprisoned in the slag, floats atop the molten liquid in the converter and is easily poured off. As this slag is periodically poured, the liquid in the converter becomes progressively rich in copper until at the end of the converting cycle the copper is about 98% pure.

This stage of purity, though it sounds high, is still too low for the electrical industry, which is the principal user of copper. Even small amounts of impurities in copper severely distort the elec-

trical properties, so these impurities must also be eliminated. This is done by electrolytic refining, a step we do not reach in the process with which we are here concerned.

Although science has provided us with many sophisticated devices for producing various items and for controlling and measuring complex processes, the scientific revolution is far from complete; and there are many pockets of endeavor where the senses—the "feel" of the practitioner—dictate the quality of the result. Cooking is a homely example— converting is another.

Man has worked with copper for over two thousand years and each generation has probably added its increment of knowledge to the art. After this length of time defendants contend there isn't much inventive space left for a combination patent in the copper converting field. Nonetheless, I think that Eugene Redmond found a place of occupancy.

Before the Redmond invention, there were generally three methods of converter operation: the blister process, the overblowing process, and the third vessel process. The blister process was, and probably still is, the most common.

A converterman using the blister process blows the white metal in the converter through the regal and clear copper stages, and terminates the blow at the blister stage. The charge is then transferred to an "anode" furnace or a "fire-refining" furnace. The fire-refining furnace continues oxidation of the charge, but at a much slower rate. Tuyeres, or air holes, funnel the air blown through the charge in a converter; in the anode furnace, however, small pipes or lances are used, and piping a 200-ton charge can take from three to five hours before peahole copper is produced. When this occurs, a fresh-cut green pole is introduced into the charge;

the heat immediately disintegrates the pole, but in the process excess oxygen is removed. Copper makers refer to this step as "poling." After poling, the copper is cast into anodes and sent on for electrolytic refining.

The overblowing process [2] in effect eliminates piping time. White metal in the converter is blown beyond blister and into the late worm or peahole stage. However, this process does not appear to be widely employed because serious disadvantages attend its use. In the overblowing process the converter temperature will usually exceed 2300° F. and may go as high as 2600° F. The excessive heat, together with the corrosive effect of oxidation, wear hard on the linings of the converter, and thus more frequent lining replacement is necessary. Further, the overblowing process produces a slag known as an "oxide" slag, which, if not carefully handled, is explosive and can be dangerous to workmen in the vicinity.

The third vessel process was conceived by Charles R. Kuzell, who appeared as an expert witness for the defendants. This process appears to be an attempt to compromise the shortcomings of the blister and overblowing processes, and while it does avoid some of these, it also introduces shortcomings of its own. The third vessel process, as the name indicates, uses a third vessel which has fewer tuyeres than a normal converter. Air is also piped in at a slower rate.

Dr. Kuzell testified that he used an old upright converter as the third vessel in order to avoid purchasing more expensive equipment. Therefore, although the third vessel process appears to eliminate piping time at the anode furnace, it introduces another transportation step into the production process and requires the purchase of additional, if relatively inexpensive, equipment.

2. The word "overblowing" is sometimes used to indicate the continuation of the blowing in the converter past the stage of copper usually reached at a particular smelter. Thus, where the blow at a particular smelter does not usually go be-yond low blister, a skimmer who continues the blowing beyond that low blister stage is said to have "overblown" the charge and the copper resulting is called "overblown" copper.

In the opinion of smelter operators, none of these three processes possessed a clear advantage over the others. The operators would first try one process, then the other, then go back to the first. Thus, the state of the art at the time Mr. Redmond introduced his improvement provided three methods—none of them completely satisfactory—for converting copper.

An apparently casual discussion with his brother, Howard, induced Eugene Redmond to attempt some experiments in adding silica flux to the copper during the finish period. Howard Redmond had worked in copper converting in Belgium, and he mentioned that sand was used in Belgium to form a dam at the mouth of the converter. He noted that after the copper had been poured, the sand (a form of silica) had a bluish-black discoloration. From this, Mr. Redmond reasoned that if a silica coating could be maintained in the converter during the finish period, it might serve to extract impurities from the copper before pouring.

In 1949, while working for Kennecott Copper, Mr. Redmond suggested an experiment that might eliminate the selinium problem that Kennecott was then having with its copper. He added sand or silica flux during the finish period. The sand began to soften soon after it was placed in the copper bath, however, and Redmond was forced to conclude his experiment prematurely. Although some of the selinium was removed by this method, the amount was still not sufficient to meet the requirements, and no further attempts were made to remove selinium in this manner.

Although it was converterman's lore that silica flux, if present during the finish period, would cause foaming in the converter, Mr. Redmond continued to wonder about the effects of having silica flux in the converter at this critical time. In May of 1952, at Kennecott's Hurley Smelter he decided to try once again to maintain a silica coating in the converter during the finish period. He added it at a later stage than he had added it during the selinium experiment. This time he was successful in maintaining the sand in a "solid" condition until the copper was poured. The result was peahole copper, a stage of copper not usually reached until the charge had been transferred to another converter and further oxidized at a reduced rate. The inventive cycle was thus complete at this point. The idea had been reduced to practice and demonstrated as true. A sample of the copper produced by this experiment was retained by Mr. Mahoney, who was present at the time the copper was poured. This sample (PX 110) was tested during the trial, and the testimony of Professor Butts established that it was peahole copper which had not been poled.

After he had successfully reduced his invention to practice Redmond continued to work on it and refine the method so that he could be sure of consistent results. By October or November of 1953 he was satisfied that he could achieve consistent results by a set of standards which he had developed.

In late November, 1955, Redmond left the Kennecott plant at Hurley, New Mexico, and went to work at San Manuel Copper Corporation. While employed there he used his process and instructed other converter operators how to use it. He also explained to the company officials that he considered his process a unique one that yielded results not previously obtained in a converter. When the company refused to offer any compensation for this idea, Mr. Redmond ordered the employees under his supervision to stop using the method he had taught them and to return to the ordinary blister method of converting. The company countermanded his order. After suit on the patent was instituted, Mr. Redmond was discharged from his employment at San Manuel, and has been unable to find employment in the copper industry since.

Redmond's first approach in securing a patent was to contact a local attorney by the name of C. C. Royall, Jr. Mr. Royall was a general practitioner. He

was neither familiar with the art of drafting patent specifications nor the process of copper converting. Mr. Redmond is a plain-spoken man of rudimentary education, and when he talks of copper converting, he uses the slang terms known among those who practice this calling. Mr. Royall was in a somewhat similar position with Mr. Redmond, in that he, Royall, knew nothing about the drafting of patent specifications. Therefore, when he began to correspond with a Washington firm of patent attorneys, some confusion was bound to result. I think that some of the inconsistencies that appear in the correspondence between Royall, and Parker and Walsh can be understood when one realizes that Redmond and his attorneys were not speaking the same language. Redmond is using the vernacular interspersed with converterman's slang; Parker and Walsh are insisting upon technical, chemical explanations and the peculiar wording of a patent specification; and Royall—who is not familiar with either the slang or the patent vocabulary—is in the middle as the mediating party. However, after reviewing this correspondence (DX 38) I am inclined to believe that there is nothing unusual in the way that this patent was prosecuted. I do not think that any undue emphasis, such as defendants urge, should be placed upon the preliminary correspondence under the facts and circumstances of this case.

■ Parker and Walsh filed the patent application in May of 1954. A brief history of the proceeding in the Patent Office as disclosed by the file wrapper (DX 21) is set forth in finding of fact number 48. The finding describes in considerable detail the course followed. Max E. Shirk replaced Parker and Walsh as patent counsel after Redmond assigned his interest in the application to the plaintiff, Brian Jackson Associates, Inc., in October 1958. The defendants contend that the disclosures contained in both the original and amended application were never adequate to sustain any of the claims sought to be allowed. They challenge the Shirk amendments particularly as containing "new matter." In submitting the amendments dated December 12 and filed December 17, 1958,[3] Shirk stated in his opening remarks (DX 21, p. 44):

"Page 5 has been amended to correct a contradictory statement.

3. "The Commissioner of Patents
Washington 25, D. C.
"Sir:
"In response to the Final Rejection, Paper No. 9, dated April 29, 1958, and to put the application in better form for appeal, applicant respectfully requests that the above entitled application be amended as follows:
"Page 5, lines 14 and 15, change 'completely oxidized' to: *free of impurities*.
"Claim 1, line 1, change 'The' to: *In the*.
"Claim 1, line 2, change 'comprises' to: *includes*.
"Claim 1, line 3, after the comma (,) insert: *and*.
"Claim 1, line 3, delete 'and through'.
"Claim 1, line 4, after the comma (,) insert: *the improvement comprising refining said blister copper through the worm stage including the steps of*.
"Claim 1, line 5, delete 'and'.
"Claim 1, line 6, change 'copper is substantially completely oxidized' to: *silica flux has formed a solid coating over said mass and pouring said mass out from under said coating*.
"Claim 2, line 1, change 'A' to: *In a*.
"Claim 2, line 1, change the insertion made by a previous amendment to: *containing free sulfur in the converter in which it is formed*.
"Claim 2, line 2, change 'comprises' to: *includes*.
"Claim 2, line 3, delete 'at a temperature not in excess of about 2250° F.'
"Claim 2, line 3, after the comma (,) add: *and*.
"Claim 2, line 5, change 'saturated with copper oxide' to: *free of said sulfur*.
"Claim 2, line 5, after the comma (,) insert: *the improvement comprising*.
"Claim 2, line 6, after 'blow' insert: *at a temperature not in excess of about 2150° F*.
"Claim 2, line 7, change 'copper is substantially completely oxidized' to: *silica absorbs said free sulfur and solidifies, and pouring the copper out from under said solidified silica*.
"Cancel Claims 3, 8 and 9."

"Claims 3, 8 and 9 have been cancelled to reduce the number of claims under consideration.

"Claims 1 and 2 have been amended to more clearly define applicant's invention.

"Applicant traverses the rejection of Claims 1, 2 and 4 as being unpatentable over Nielsen, British Patent No. 472,626."

Shirk then continued with his explanation and argument in support of the amendments. At the time he filed these amendments, Shirk also submitted a brief to support the appeal from the examiner's final rejection. On February 3, 1959 the application was allowed. The fact that the patent in suit was granted necessarily means that the Patent Office did not consider the amendments to the application "new matter" within the meaning of its rules or the statute (35 U.S.C.A. § 132). Since the Patent Office is constantly determining and defining what is and what is not new matter, its decision is entitled to special weight. Helms Products v. Lake Shore Mfg. Co., 227 F.2d 677 (7 Cir. 1955).

In arguing that the Shirk amendments introduced new matter into the disclosure of the invention, counsel for the defendants rely on Aetna Steel Products Corp. v. Southwest Products Co., 282 F.2d 323 (9 Cir. 1960). I believe the case is inapposite.

The law applicable to the issuance of patents is largely statutory and much, if not most, patent litigation involves factual findings as to whether a particular patent application, the content thereof, and the procedure followed in granting or denying such application meet the statutory requirements and Patent Office regulations.

The distinction between the *Aetna* case and this one is basically factual. In *Aetna* the court was concerned with a relatively simple mechanical bearing known as a self-aligning bearing. It was an almost commonplace article, simple in nature and design, easily examined, and comprehensible in function. Its purpose and principles of operation required very little, if any, expert testimony.

In *Aetna* the court, in substance, held that all the features of the patent there in suit as disclosed prior to the amendment of March 7, 1950, were old in the art. At that point the application had to be denied. The court then held that the amendment which apparently caused the Patent Office to issue the patent, added nothing; to use the language of the decision:

"(T)he March 7, 1950 amendment is either new to the application—hence unpatentable—or no more than a scientific explanation of what takes place in the manufacture of Potter's originally described article *as well as other bearings* patented in the art." (282 F.2d 323, 334; emphasis supplied)

The court, in concluding the decision, stated that the patent was invalid as a matter of law. In other words, the Potter Patent was so clearly not patentable over the prior art that it was unnecessary to rely upon any expert or other testimony or upon any factual findings by the trial court. That is not the situation here.

■ An understanding by a non-expert of the process involved in the patent in suit requires the assistance and explanations of those skilled in the art and also of experts and scholars trained in the fields of metallurgy and chemistry. We have had the benefit of such testimony and evidence in the trial of the Kennecott case and again in the trial of the present case before me. Therefore, considering (1) the regularity of the Patent Office procedure in the prosecution of the Redmond application for patent; (2) the presumption of invention attendant upon a Patent Office determination, 35 U.S.C.A. § 282, Troy Co. v. Products Research Co., 339 F.2d 364 (9 Cir. 1965); (3) the prior decision of Judge Walsh holding the Redmond patent valid in all its claims, Cold Metal Process Co. v. Republic Steel Corp., 233 F.2d 828 (6 Cir. 1956); and (4) the substantial credible evidence to support

the novelty and effectiveness of the Redmond Process which was given in the present trial by witnesses skilled in in the art of copper refining, competent experts highly knowledgeable in the fields of copper metallurgy and chemistry, and a patent attorney highly conversant with patent procedure, I have concluded that none of the defenses urged by the defendants against the validity of the Redmond Patent are sustained by the evidence.

When I reviewed the evidence as to the issue of infringement I found, as Mr. Taylor had indicated in his affidavit opposing consolidation, the issue in this case was apparently substantially different from the infringement question presented and tried in the Kennecott case.

I concluded, as my findings of fact numbered 54 through 61 indicate, that claims 1 and 3 had been infringed. In reaching this conclusion, I have relied principally on the testimony of Mr. Redmond, Professor Butts, Mr. Cullom, charts in evidence, such as DX 84, and the explanation given as to their meaning and significance, and I have also relied to a lesser degree upon the testimony of the skimmers.

In a case such as this, where much of the evidence is technical and complicated and there are many witnesses, credibility plays a very important part. For this reason, I will set forth the evaluation I have given the testimony of the principal witnesses whose evidence contributed materially to my decision.

Several of the most important witnesses, such as Eugene R. Redmond, Charles R. Kuzell, John T. Cullom, were highly interested because they were associated with the litigants and would be affected by the outcome of the suit.

In assessing credibility the court is guided to a large extent by the manner and demeanor of the witness while testifying. In observing a witness the court notes such factors as his responsiveness and hesitation or tendency to evade; the court considers whether he appears to have knowledge and whether he has a reasonable recollection of the facts pertaining to the subject matter of the interrogation; the court also considers whether the witness is biased or partisan. Many of these considerations cannot be gleaned from a cold record. However, in evaluating evidence for or against a particular finding, the following observations regarding witnesses should be noted as contributing to the decision reached by the court:

*Eugene R. Redmond.* I found Mr. Redmond to be a simple, sincere, straightforward person. He was obviously exceptionally skilled in the art of copper converting. While Redmond is neither a scientist nor a metallurgical theorist, he has an inquisitive mind and is an acute observer of the converting process. When Redmond testified I felt he was describing the events as he remembered them and that his description was not materially altered by bias or partisanship. I attach great weight to his testimony.

*Curtis L. Wilson.* Dean Wilson appeared to have a very comprehensive and general knowledge of copper metallurgy but is not as experienced as some of the other experts in the particular aspect of copper converting under consideration. Although he is the co-author of a widely-used general textbook, "Metallurgy of Copper" (PX 52), many of the aspects of this case concerned narrow theoretical areas with which Dean Wilson, from his training and experience, could not be expected to be completely informed. I attach average weight to his testimony.

*Allison Butts.* Professor Butts impressed me as a true scholar. He appeared to be very familiar with the theoretical problems in this case. During both direct and cross-examination, he showed a complete grasp of metallurgical theory as it applied to the facts of this case. When confronted with new data he did not become contrary but, in my opinion, assessed the new material fairly and impartially. I attach great weight to his testimony.

*Herbert H. Kellogg.* Professor Kellogg also impressed me as a true scholar. He is a professor of extractive metallurgy at the Henry Krumb School of Mines, Columbia University. He appeared to be a very competent metallurgist and his testimony on the stand indicated that he had thoroughly researched the problems associated with this case. His demeanor and manner of testifying was professional, scientific, impartial and seemingly unbiased. While I have not followed Professor Kellogg's analysis in every instance I attach great weight to his testimony.

*Charles R. Kuzell.* Dr. Kuzell is very well informed on converter theory and practice as well as with other aspects of copper production. His metallurgical experience has been almost exclusively in copper. Although presently retired, he was at the time of trial on the Board of Directors of the Phelps-Dodge Corporation. However, from my observation generally, of his demeanor during the two weeks of trial and particularly, of his way of answering questions, I feel that Dr. Kuzell was a very partisan witness for the defendants. Conceding his competency I find it necessary to discount his testimony because of bias.

*John T. Cullom.* Mr. Cullom is the Smelter Superintendent of the San Manuel Smelter. In this position he is naturally familiar with all aspects of the smelting operations, including the converting process. However, since his knowledge is broader and more general, he does not have that same degree of specific knowledge of converter operations which Mr. Redmond has. During the trial Mr. Cullom was candid, fair and impartial in his answers. Within the range of his particular expertise, I attach great weight to his testimony.

*John H. Dalton.* Because Mr. Dalton's testimony came in by deposition, it was impossible for the court to evaluate his demeanor. As there was no opportunity to compare his performance with those of the other witnesses, I can only give his testimony average weight.

*Testimony of the Skimmers.* Generally, I found the skimmers were candid and straightforward in their testimony. Some of these men are more aware of the reasons behind their operations than others, but generally, the weight accorded to their testimony was approximately equal. No one particular skimmer was relied on more than any of the others.

*George Samuel Hawkins.* Mr. Hawkins was called as a fact witness to testify on the state of the art prior to the Redmond patent. The circumstances under which he was called indicate that his appearance came almost as an afterthought. He testified that Phelps-Dodge had used a process essentially the same as the Redmond process for about a year, in 1930. Hawkins was therefore testifying about events which had taken place thirty-five years ago. He said he recalled these events, yet he had difficulty remembering the date on which he was shown a particular exhibit when that date was not over two months prior to the trial. Hawkins also had difficulty comprehending the questions put to him by plaintiffs' counsel. Mr. Hawkins receives a pension from the Phelps-Dodge Corporation. He was also interviewed before the trial by Dr. Kuzell, a director of Phelps-Dodge and an expert witness for the defense in this case.

Considering all the circumstances surrounding this testimony as well as the length of time which has elapsed since the claimed events took place in Mr. Hawkins' life, I cannot give any weight to his testimony.

The foregoing discussion and comment may be considered supplemental to this court's findings of fact and conclusions of law.

A form of decree in accordance with the findings of fact and conclusions of law will be submitted by counsel for plaintiffs on or before August 1, 1966.